## Mikell, Trustee *v.* Philadelphia School District et al.

Argued March 24, 1948. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*William H. S. Wells*, with him *Maurice Bower Saul* and *Saul, Ewing, Remick & Saul*, for plaintiff.

*C. Brewster Rhoads*, with him *Edward Breen Soken, Stephen T. Dean* and *George G. Chandler*, for defendants.

*John C. Phillips*, Deputy Attorney General, with him *H. F. Stambaugh* and *T. McKeen Chidsey*, Attorney General, for Commonwealth.

*Mortimer B. Lesher*, with him *N. R. Criss*, for Pittsburgh School District and Pittsburgh School District Board of Education, intervenors.

OPINION BY MR. JUSTICE JONES, April 12, 1948:

This is a suit to enjoin enforcement of an Act of Assembly (June 20, 1947, P. L. 733, 24 PS § 581.1-581.16) which imposed a personal property tax upon the residents of first class school districts ". . . for public school purposes . . .". There are two such districts in the State, viz., Philadelphia and Pittsburgh. The plaintiff, a resident of the School District of Philadelphia, is a testamentary trustee and, as such, holds the title to intangible personal property which, by the terms of the Act, is expressly subjected to the tax. He challenges the validity of the Act on the ground that it is unconstitutional; there are no facts in dispute; and the matter is now before us on original jurisdiction. As a decision would automatically bind the School District of Pittsburgh, the latter and its Board of Public Education were, upon petition, permitted to intervene as parties defendant, make oral argument and file printed brief.

On March 26, 1948, the issues of the litigation then having been thoroughly argued by counsel for all parties to the record, as well as by the Attorney General (acting by a deputy) on behalf of the Commonwealth, we entered an order dismissing the bill with a statement that an opinion would be filed in due course. This opinion is in intended fulfillment of that commitment.

The plaintiff's principal contention is that the Act in question is a revenue-raising measure which originated in the Senate instead of in the House of Representatives and is, therefore, violative of Art. III, Sec. 14, of the Pennsylvania Constitution. He further contends that the Act lacks the uniformity required by Art. IX, Sec. 1, of the State Constitution with respect to tax legislation and that a consequent discriminatory effect, due to the asserted want of uniformity, further violates the "right of property" and the "due process" clauses of Secs. 1 and 9, respectively, of Art. I of the Pennsylvania Constitution as well as the "due process" clause and the "equal protection" guarantee of the Fourteenth Amendment of the Constitution of the United States.

It is presently unnecessary to treat with the rationale underlying the constitutional provision that bills for raising revenue shall originate in the lower or more popularly constituted house of the legislature or even to point out the complete absence of the traditional reason for the requirement under our State's form of government wherein both branches of the legislature are equally responsible directly to the people.[1] The purely

---

[1] The constitutional requirement that all bills for raising revenue shall originate in the House of Representatives stemmed from a remedial outgrowth of the historic conflict between Parliament (i.e., Commons) and the Crown whose ability to dominate the monarchically appointive and hereditary Lords was patent. See Story, *Constitution*, Fifth Ed., Vol. 1, Sec. 874 et seq.; Cooley, *Constitutional Limitations*, Eighth Ed., Vol. 1, pp. 267-268; Sutherland, *Statutory Construction*, 3rd Ed., Vol. 1, Sec. 806. There was a measure of like justification for the insertion of the provision as Art. I, Sec. 7, Cl. 1,

technical aspect of the plaintiff's main complaint would render all the easier our appropriate observance of Mr. Justice DREW's caution to courts generally in *Hadley's Case*, 336 Pa. 100, 104, 6 A. 2d 874, "not to be astute in finding or sustaining objections" to Acts of Assembly whose *prima facie* constitutionality is legally presumed: see also *Kelley v. Baldwin*, 319 Pa. 53, 54, 179 A. 736; and *Tranter v. Allegheny County*, 316 Pa. 65, 75, 173 A. 289. Indeed, it would be more than difficult for a court to say that, because of the procedural directive of Art. III, Sec. 14, the assailed Act was *"clearly, palpably, plainly"* violative of our State Constitution, as Chief Justice BLACK stated the test in *Sharpless v. Mayor of Philadelphia*, 21 Pa. 147, 164. But, we need not base our decision with respect to the particular constitutional provision, now under consideration, upon its present-day inappropriateness.

The Act in question is not a revenue-raising measure within the meaning of that term as used in Art. III, Sec. 14, of the Pennsylvania Constitution. To qualify as a bill within the purview of the cited constitutional provision, at least the revenue derived from the tax imposed should be coverable into the treasury of the exacting

---

of the Federal Constitution. At that time (1787) and thereafter until the adoption (in 1913) of the Seventeenth Amendment providing for the direct election of Senators, the members of the United States Senate were elected for each State by the joint vote of both houses of the legislature of the respective State and, hence, were removed from the people. The provision was first imported into a Constitution of this State in 1790. That was evidently done as a conforming gesture to the similar requirement of the Federal Constitution of three years before, for all members of the legislature have been elected in Pennsylvania by a direct vote of the people since our first Constitution of 1776. Incidentally, that Constitution, which was formulated in a convention presided over by Franklin, did not follow the English pattern by specifying a house of origin for revenue-raising bills for the obviously sufficient reason that, under the Constitution of 1776, Pennsylvania had a unicameral legislature,— the first in America.

sovereign for its own general governmental uses, and that is not the situation in the present instance.

In *United States v. Norton*, 91 U. S. 566, 568, where the like provision of the Federal Constitution (Art. I, Sec. 7) that "all bills for raising revenue shall originate in the House of Representatives" was up for construction, Mr. Justice SWAYNE, speaking for the Court, quoted approvingly (p. 569) from Story on the *Constitution*, Fifth Ed. (1891), Vol. 1, Sec. 880, to the effect that, according to the practical (i.e., congressional) construction of the Constitution, the particular limitation " 'has been confined to bills to levy taxes *in the strict sense of the words*, and has not been understood to extend to bills for other purposes which incidentally create revenue' ". (Emphasis supplied.) It was there further noted (p. 569) that, "The precise question before us came under the consideration of Mr. Justice STORY, in the United States v. Mayo, 1 Gall. 396. He held that the phrase *revenue laws*, as used in the Act of 1804, meant such laws 'as are made for the direct and avowed purpose of creating revenue or public funds for the service of the government.' " In *Twin City Bank v. Nebeker*, 167 U. S. 196, 202-203, a tax upon the average amount of the circulating notes of a banking institution was held not to be a revenue-raising measure within the meaning of the constitutional directive. Mr. Justice HARLAN, who spoke for the Court in that case, reiterated in part the quotation from Story contained in the *Norton* case, supra, and added that "There was no purpose by the Act or by any of its [taxing] provisions to raise revenue to be applied in meeting the expenses or obligations of the Government." Likewise, in *Millard v. Roberts*, 202 U. S. 429, an act of congress taxing property in the District of Columbia in order to provide funds for the construction of railroad terminal facilities in the District was held not to be a revenue-raising measure upon the expressed sole authority of *Twin City Bank v. Nebeker*, supra. Similarly, in *Geer v. Board of Commissioners*, 97 Fed. 435, Circuit Judge SANBORN of the

Eighth Circuit ruled that a Colorado statute providing for the refunding of the bonded indebtedness of several counties of the State and authorizing the levy of taxes to liquidate the bonds and coupons, as due, was not a bill for raising revenue within the meaning of the provision in the Colorado Constitution (Art. V, Sec. 31) that all revenue bills should originate in the House of Representatives.

The case of *Chicago, B. & Q. R. Co. v. School Dist. No. 1*, 63 Colo. 159, 165 Pac. 260, is of especial present interest. In that case, there was involved a statute of Colorado which levied " a Special School Tax" to maintain the public school system of the State. The Act had originated in the Senate and was attacked on the ground that it violated the State's Constitution, cit. supra. In ruling that the Act was not a revenue measure and, therefore, not violative of the State Constitution in the particular indicated, the Supreme Court of Colorado held that "The levy and collection of taxes for the maintenance of a school system is not taxation for 'defraying the expenses of the government' . . . or . . . [the] 'levying of taxes in the strict sense of the words,' . . .". The Court quoted from one of its own earlier decisions (*People v. Commissioners*, 12 Colo. 89, 93, 19 Pac. 892, 894) where, after having stated that "The doctrine is elementary that no act of the general assembly should be declared unconstitutional unless it is clearly and palpably so", the Court stressed the peculiar pertinence of the doctrine when treating with constitutional objections to statutes intended to promote and maintain public schools, saying in that connection that "In a matter so important as the maintenance of public schools, the courts should incline to uphold, rather than to defeat, the action of the officers charged with the execution of the laws". The obligation so resting upon a court in the given circumstances can be no less in this State where "the maintenance and support of a thorough and efficient system of public schools" is a constitutional

mandate (Art. X, Sec. 1) laid directly upon the General Assembly whose agencies for the discharge of the duty are the various school districts. See *Wilson v. Philadelphia School District,* 328 Pa. 225, 231, 195 A. 90. It could be only in a very plain and indisputable case of constitutional impingement that the courts would be justified in thwarting the legislature in its chosen manner of fulfilling its constitutional duty. Again, in *Evers v. Hudson,* 36 Mont. 135, 92 Pac. 462, 466, an act imposing a tax to supply funds for current school expenses which had originated in the Senate was attacked as a violation of Art. V, Sec. 32, of the Montana Constitution which provides that "All bills for raising revenue shall originate in the House of Representatives;" etc. The Supreme Court of the State rejected the contention on the authority of an earlier decision by the same Court (*State v. Bernheim,* 19 Mont. 512, 49 Pac. 441) where it was held, in the language of Story, that "the provision of the Constitution now under consideration must be confined in its meaning to bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which may incidentally create revenue". The Court further pointed out in the *Evers* case that "In any event, the tax is only upon the property of the county, and the funds to be raised belong exclusively to the particular school for which they are raised. No part of the funds can by any possible means find its way into the state treasury, and the provisions of this section of the Constitution clearly refer to revenues of the state." There are a number of other supporting decisions, but it is unnecessary to labor the point.

In the present instance, there can be no suggestion that any part of the tax imposed by the Act will be used for the State's governmental purposes. As in the *Evers* case, supra, the impost is laid upon personal property of residents of designated school districts and the taxes collected will be used for public school purposes within such districts. The Act so stipulates. It is true that the

described personal property is directly made taxable by the Act, but the annual levy, within the statutorily specified maximum and minimum limits, is a matter for the independent action of the respective boards of public education of the designated districts. If the tax be not so levied annually, there will be none, save upon the happening of one contingency, with which we are not now confronted (cf. *English v. Robinson Township School District*, 358 Pa. 45, 55 A. 2d 803), viz., that the Act be judicially declared an unconstitutional delegation of the State's taxing power: see Sec. 16(c) of the Act. In that event, and in that event only, the Act would impose a tax but, even then, specifically for public school purposes of the particular districts. For the reasons given, we are unanimous that the Act in question is not a bill for raising revenue within the meaning of Art. III, Sec. 14, of our State Constitution.

The cases cited by the plaintiff are not controlling nor even in point. *Hubbard v. Lowe*, 226 Fed. 135 (D. C. S. D. N. Y.), involved the Federal Cotton Futures Act which, in an effort to prevent cotton futures contracts, imposed a punitive tax. The question whether the Act, which had originated in the Senate, was a revenue measure within the meaning of Art. I, Sec. 7, of the Federal Constitution was not before the court for decision. As Judge HOUGH states at p. 137, he was "saved from inquiry whether the Cotton Futures Act is a 'bill for raising revenue' by the agreement of counsel . . ." that the Act was "a revenue bill within the constitutional meaning". However, in passing, Judge HOUGH gave it as his view "that nothing was further from the intent or desire of the lawmakers than the production of revenue, . . .". Moreover, the taxes assessed were payable into the general funds of the United States in the Treasury and there utilizable for governmental purposes generally. The latter circumstance alone plainly differentiates the *Hubbard* case from the present. In *Wofford Oil Co. v. Smith*, 263 Fed. 396 (D. C. Ala.), relied upon by the

plaintiff, the Alabama statute, there involved, which was intended to regulate the sale, etc. of gasoline and other liquid fuels and, for such purpose, imposed an inspection tax, was invalidated on the ground that the Act violated the Commerce Clause of the Constitution of the United States. True enough, the Act was also attacked on the ground that it proceeded from a bill to raise revenue which had been introduced in the State Senate in violation of Sec. 70 of the Constitution of Alabama; and, by way of obiter dictum, the court went on so to hold. Nonetheless, the conclusion in such regard is readily explainable. As the court there found, "90 per cent. of all the funds raised and paid into the state treasury is left free from the cost incident to inspection, and obviously is to be used by the state for general purposes". Again, *In Re Opinions of the Justices,* 190 So. 824, the Supreme Court of Alabama gave the State Senate an advisory opinion that a pending bill, intended to amend the State Sales Tax Act, was a revenue bill within the meaning of Sec. 70 of the Alabama Constitution. By the titles to both the original Act and the proposed amendment, their purpose was to provide "for the general revenue of the State of Alabama" which, of course, was sufficient to make the bill one to raise revenue in the constitutional sense.

There is a further effective barrier to the plaintiff's attack that the Act violates Art. III, Sec. 14, of the State Constitution. The clause concerning the place of origin of a bill for raising revenue is a procedural directive and not a substantive interdict. The legal distinction between directory and mandatory laws is as applicable to fundamental as it is to statutory law: *Armstrong v. King,* 281 Pa. 207, 216, 126 A. 263. The provision in question could not reasonably be deemed other than directory. It is not a denial of the Senate's power as a coordinate and essential branch of the legislature. Indeed, a further clause of the same Article and Section expressly confirms the Senate's own important function

and discretion in the due enactment of revenue legisla-
tion. Specifically, "the Senate may propose amendments
as in other bills" : Art. III, Sec. 14. In pursuance of its
appropriate power in such regard, the Senate may amend
a House revenue bill even to the extent of striking out
everything following the enacting clause and substitut-
ing therefor a bill of its own creation. It follows, there-
fore, that a revenue statute, once enacted, is not in-
herently defective simply because the bill originated in
the Senate and was passed first by that body. And, in-
asmuch as the particular constitutional provision is
merely directory, any failure to follow it in practice
must be objected to timely. If that is done, as on a point
of order, the objection would, of course, be efficient to
block the passage of the measure. The members of the
legislature are to be presumed to intend due respect for
all constitutional requirements concerning the enact-
ment of statutes. Such provisions, however, are manda-
tory only "So far as the duty and the consciences of
the members of the legislature are involved . . ." : *Kil-
gore v. Magee*, 85 Pa. 401, 412, where the presently mate-
rial assault on the statute there involved was that "It
was not read at length on three different days in each or
either house of the General Assembly" : see Art. III,
Sec. 4.

A failure of the legislature to follow a directory pro-
vision of the Constitution, respecting the introduction
and passage of legislation, does not present a justiciable
question, and, in no event, does it impair the validity of
a duly certified enactment. In the *Kilgore* case, supra,
this Court said at p. 412 that "In regard to the passage
of the law and the alleged disregard of the forms of
legislation required by the constitution, . . . *the subject
is not within the pale of judicial inquiry*". (Emphasis
supplied.) The same sentiment was voiced by Mr. Chief
Justice WHITE in *Rainey v. United States*, 232 U. S. 310,
where, in approving the ruling of a lower court that the
amendment there in question was "not void as a bill for

raising revenue originating in the Senate and not in the House of Representatives", the learned Chief Justice cautioned that the court was not "intimating that there is judicial power after an act of Congress has been duly promulgated to inquire in which House it originated . . . ". It so happens that there is no decision in this State on the particular constitutional provision now under consideration. Sutherland, in his work on *Statutory Construction* (3rd Ed.), Vol. 1, § 806, observes that "The question of origin is not litigated frequently". The reason for that, undoubtedly, is that in many States, as in Pennsylvania, after the enrollment of a duly signed and certified enactment, the courts will not go behind the face of the statute in order to search out and act upon a possible noncompliance, during its passage, with a purely procedural direction. *Kilgore v. Magee,* supra, is in point by close analogy. It was there held (p. 412) that ". . . when a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage". And in *Rainey v. United States,* supra, at p. 317, the Supreme Court spoke to like effect that "Having become an enrolled and duly authenticated Act of Congress, it is not for this Court to determine whether the amendment was or was not outside the purposes of the original bill".

In *Perkins v. Philadelphia,* 156 Pa. 539, s. c. 554, 27 A. 356, the Act of May 24, 1893, P. L. 124, purported to abolish commissioners for the erection of public buildings in Philadelphia appointed under a special Act of August 5, 1870 (see Acts of 1871, Appendix, 1870-P. L. 1548). The 1893 Act was assailed on the ground that it was unconstitutional for a number of reasons, *inter alia,* that notice of the contemplated passage of the Act (being local or special) had not been published and exhibited as required by Art. III, Sec. 8, of the Constitution. This court, by a vote of four to three (see p. 547), held that the abolishing Act of 1893 was unconstitutional as viola-

tive of certain constitutional provisions (see opinion at p. 555 et seq.) but rejected the contention that the Act offended against Art. III, Sec. 8, saying in that connection (p. 568),—"As to the averment, that the act also violates section 8, article 3, because notice of the proposed legislative action was not published in Philadelphia at least thirty days before the introduction of the bill, we can only say, it is not our duty to go behind the law to inquire whether all the precedent formalities have in fact been complied with. The evidence that notice has been published is to be exhibited to the general assembly; it is not directed to be entered on the journals. The law before us is certified by both houses and approved by the governor. We must presume the requirement as to notice was complied with; to this effect are all the authorities of numerous adjudicated cases on the same question." Obviously, on that point, this Court was unanimous, for the three dissenters were of the opinion (see dissents p. 568 et seq.) that the Act did not violate any provision of the Constitution.

The plaintiff argues that it is unnecessary to go behind the Act of 1947, supra, in order to determine authoritatively that the bill was introduced in the Senate and consequently, in disregard of the direction of Art. III, Sec. 14, of the Constitution. This contention is based upon the fact that the Report of the Committee of Conference on the bill (Printer's No.-624) shows that the Act was Senate Bill No. 852; and a copy of the conference report, with the Act appended, was placed in the record in this case by stipulation of counsel. The information thus supplied is entirely *dehors* the Act which, as enrolled, bears no indication whatsoever of the place of its legislative origin. It is manifest, therefore, that, in order to show that Act No. 319 was introduced in the General Assembly as a Senate bill, evidence *aliunde* is necessary for which purpose legislative journals, records and reports are not competent. In *Harwood v. Wentworth*, 162 U. S. 547, 562, Mr. Justice

HARLAN, in speaking for the Supreme Court, declared there was no reason to modify the principles announced in *Field v. Clark*, 143 U. S. 649, 680, and, accordingly, held that an Act of a territorial legislature, having been officially attested by the presiding officers, approved by the Governor and officially lodged as a due enactment, was "to be taken to have been enacted in the mode required by law, and to be unimpeachable by the recitals, or omission of recitals, in the journals of legislative proceedings . . .". In *Field v. Clark*, the case above cited by the Supreme Court, it had been stated (p. 680), —"We are of opinion, for the reasons stated, that it is not competent for the appellants to show, from the journals of either house, from the reports of committees or from other documents printed by authority of Congress, that the enrolled bill designated H. R. 9416, as finally passed, contained a section that does not appear in the enrolled act in the custody of the State Department." Cf. also *Twin City Bank v. Nebeker*, supra, at p. 203, and *Flint v. Stone Tracy Co.*, 220 U. S. 107, 143.

Moreover, the plaintiff concedes that the principle for which *Kilgore v. Magee*, supra, and *Speer v. Plank-Road Company*, 22 Pa. 376, 378, stand is that "the enrolled bill is the conclusive evidence of statutory enactment and no other evidence is admissible to establish that the bill was not lawfully enacted" and then immediately adds that "This is the common law rule with which Sutherland [on *Statutory Construction*, 3rd Ed., Vol. 1, § 1403, p. 225 et seq.] disagrees, but which appears to be the rule adhered to in a number of jurisdictions, including the Pennsylvania and Federal courts [citing cases]".

The Act does not violate the tax uniformity requirement of Art. IX, Sec. 1, of our State Constitution. There is no want of uniformity because one of the first class school districts may possibly levy a tax (within the limits prescribed by the Act) at a rate different than that levied by the other: see *Moore v. Pittsburgh School*

*District,* 338 Pa. 466, 471-473, 13 A. 2d 29, and *English v. Robinson Township School District,* 358 Pa. 45, 53, 55 A. 2d 803. Here, also, counsel for plaintiff appropriately concedes that "It is accordingly well settled that the Legislature may provide in the same taxing statute for a different rate of tax for school purposes on the same class of property situated in Pittsburgh and Philadelphia for the reason that, for the purposes of the 'uniformity clause,' each school district is 'the authority levying the tax' ".

The alleged want of uniformity stressed by the plaintiff will result, so he contends, from the administration of Sec. 3(d) of the Act which authorizes a proration between the two first class school districts of the tax levied by one of the districts where the same property happens to be subject under the Act to tax in both districts because of the respective residences therein of two or more trustees or joint owners of such property.[2] The authorized proration applies only between the school districts capable of levying the tax imposed by Act No. 319. The provision is designed to obviate purely accidental double taxation under the same Act and does not make for a want of uniformity. The scheme of equitable adjustment of a tax in the given circumstances is

[2] Sec. 3(d) provides as follows:

"(d) Whenever any personal property *taxable under the provisions of this act* is held, owned, or possessed as trustee, agent, attorney-in-fact, or in any other manner as hereinabove set forth *by two or more persons,* copartnerships, unincorporated associations, companies, limited partnerships, joint-stock associations, or corporations all of which are residents of the Commonwealth, but *not all of which are domiciled in the same school district levying this tax,* return of such personal property shall be made in a school district of the first class where any of the same are domiciled, and *there shall be paid in each such school district that portion of the tax imposed upon such personal property* so held, owned or possessed *as the number of such trustees,* agents or attorneys-in-fact, *domiciled therein bears to the total number thereof,* notwithstanding the residence of any beneficiary, or the place where such personal property is kept." (Emphasis supplied.)

not new to the law of this State. The amendment of June 19, 1939, P. L. 413, of the Personal Property Tax Act of June 17, 1913, P. L. 507, 72 PS § 4821, provided that, where personal property was held by two or more persons as trustees and such trustees resided in different counties, there should be paid to each county such portion of the tax as the number of trustees domiciled in a taxing county bore to the total number of trustees. That provision was upheld by this Court in *Fidelity-Philadelphia Trust Company's Appeal*, 337 Pa. 34, 10 A. 2d 547. In speaking for this Court in that case, Mr. Justice LINN found no constitutional objection to the provision and further said (p. 40) in justification thereof,—"For the purpose of distributing the proceeds of such a tax among the counties for whose benefit the state imposed the tax, their classification according to the respective residences of co-trustees is not unreasonable. The court may not require the legislature, in making such classification, to disregard the legal protection afforded by a county to a resident co-trustee who is part holder of the legal title of the subject of taxation: [citing cases]." Under Sec. 3 (d) of the Act here in question, the same trust or jointly owned property will pay totally the equivalent of one school district tax under the Act of 1947, supra. And, that is all that the plaintiff or any other owner of personal property subject to the tax will be required to pay.

With the question of uniformity thus disposed of, the basis for the plaintiff's other constitutional objections to the Act evaporates. It is the assumed discriminatory effect which the plaintiff imputes to the Act, because of the alleged want of uniformity, whereon he bases his claim of a want of due process under the State and Federal Constitutions and a lack of equal protection of the laws likewise in asserted violation of the Fourteenth Amendment.

Accordingly, the order of March 26, 1948, dismissing the bill was entered.

Bill dismissed at plaintiff's costs.