Vincent J. **FUMO**, individually as a taxpayer, and in his official capacity as a State Senator, Consumers Education and Protective Association, and Tenant Action Group, Petitioners,

v.

The **PENNSYLVANIA PUBLIC UTILITY COMMISSION**, and John M. Quain, Chairman Pennsylvania Public Utility Commission, Respondents.

Commonwealth Court of Pennsylvania.

Argued March 18, 1998.

Decided Sept. 24, 1998.

As Amended Sept. 29, 1998.

Philip A. Bertocci, Philadelphia, Christopher B. Craig, Harrisburg, for petitioner.

Howard G. Hopkirk, Deputy Atty. Gen., Harrisburg, for respondent.

Maxine M. Woelfling and Linda J. Shorey, Harrisburg, for intervenor.

Before COLINS, President Judge, and DOYLE, McGINLEY, PELLEGRINI, FRIEDMAN, FLAHERTY and LEADBETTER, JJ.

DOYLE, Judge.

Before this Court in our original jurisdiction are the preliminary objections of the Pennsylvania Public Utility Commission and its Chairman, John M. Quain, (collectively, PUC) to a Petition for Review filed by Senator Vincent J. Fumo, both individually and in his official capacity as a state senator.

On April 27, 1995, House Bill 1509 (Bill), printer's number 1762 was introduced in the Pennsylvania House of Representatives. The Bill, which at that time consisted of two pages, proposed to amend the Public Utility Code by increasing the maximum number of years that a taxi cab may be operated from six to eight years, and was referred to the House Consumer Affairs Committee.

On May 23, 1995, the Bill was reported out of committee as committed in its original form and was immediately referred to the House Appropriations Committee. The Bill was then reported out of that committee, still in its original form on June 5, 1995, for consideration by the entire Pennsylvania House of Representatives. The Bill was passed by the House by a vote of 203–0 and was sent to the Senate.

In the Senate, the Bill was referred to the Senate Consumer Protection and Professional Licensure Committee. After remaining in that committee for approximately seventeen months, the Bill, still in its original form, was reported out of that committee on November 18, 1996, and was referred to the Senate Rules and Executive Nominations Committee. While in that committee, the Bill underwent substantial modification, further amending the Public Utility Code to include the

addition of 84 pages of amendments relating to the deregulation of the generation of electricity. On November 20, 1996, the Bill was reported out of the Rules and Executive Nominations Committee and was referred to the Appropriations Committee. On November 25, 1996, the Senate Appropriations Committee reported out the Bill. Following debate, as well as proposed amendments to the Bill, it was passed by the entire body of the Senate by a vote of 40–10 [1] and was then sent to the House for concurrence in the Senate amendments. Following discussion and some debate of the Bill in the House, that chamber did concur in the Senate amendments on November 25, 1996, by a vote of 171–40. House Bill 1509, printer's number 4282, was subsequently signed into law by Governor Ridge on December 3, 1996 and became Act 138 of 1996 (Act 138).

On March 18, 1997, Senator Fumo filed a Petition for Review challenging the enactment of Act 138 on the grounds that it was enacted in violation of Sections 1, 3, and 4 of Article III, of the Pennsylvania Constitution. Those Sections of Article III provide as follows:

### § 1. Passage of laws

No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose.

. . . .

### § 3. Form of bills

No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof.

### § 4. Consideration of bills

Every bill shall be considered on three different days in each House. All amendments made thereto shall be printed for the use of the members before the final vote is taken on the bill and before the final vote is taken, upon written request addressed to the presiding officer of either House by at least twenty-five per cent of the members elected to that House, any bill shall be read at length in that House. No bill shall become a law, unless on its final passage the vote is taken by yeas and nays, the names of the persons voting for and against it are entered on the journal, and a majority of the members elected to each House is recorded thereon as voting in its favor.

Pa. Const. art. III, §§ 1, 3, 4. Based on these averments, Senator Fumo has requested a declaration from this Court that the enactment of Act 138 violated the Pennsylvania Constitution, and was thus void, as well as an order permanently enjoining the Chairman of the PUC from taking any action pursuant to Act 138. On April 17, 1997, the PUC filed Preliminary Objections to the Petition for Review. Specifically, the PUC argued that Senator Fumo lacked standing to bring the claim and that the claims set forth in the Petition for Review involve non-justiciable political questions pursuant to the Enrolled Bill Doctrine.

We will first address the PUC's objection relating to the justiciability of this claim, finding that dispositive of the litigation.

■ The starting point of our analysis is the presumption of constitutionality that all legislative enactments enjoy under both the rules of statutory construction and decisions of the courts. *See* 1 Pa.C.S. § 1922(3); *Common Cause of Pennsylvania v. Commonwealth*, 668 A.2d 190 (Pa.Cmwlth.1995), *aff'd*, 544 Pa. 512, 677 A.2d 1206 (1996); *Snider v. Thornburgh*, 496 Pa. 159, 436 A.2d 593 (1981). Under the Enrolled Bill Doctrine, a court will not look beyond the certified enactment of the legislation to the process by which the law came to be passed. The rationale of this principle of judicial restraint was explained as follows:

[W]hen a law has been passed and approved and certified in due form, it is no part of the duty of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage.... The presumption in favor of regularity is essential to the peace and order of the state.

---

1. The ten senators voting against the Bill were Senators Belan, Bell, Bodack, Fumo, Hughes, Kasunic, Kitchen, La Valle, Tartaglione, and Williams.

*Common Cause,* 668 A.2d at 195 (quoting *Kilgore v. Magee,* 85 Pa. 401, 412 (1877)).

■ The deference afforded by the courts under the purview of the Enrolled Bill Doctrine is not mandatory, of course, but rather is discretionary in nature. Therefore, in limited and compelling circumstances, courts of this Commonwealth have not followed the general rule of abstention, but have looked beyond the certified law to the enactment process. *See Common Cause; Consumer Party v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986).

In *Consumer Party,* Senate Bill 270, the bill at issue in that case, began as legislation to fill vacancies in third through eighth class counties. Specifically, the title of that bill read as follows:

An act amending the act of August 9, 1955 (P.L. 323, No. 130), entitled 'an act relating to counties of the third, fourth, fifth, sixth, seventh, and eight classes; amending, revising, consolidating and changing the laws relating thereto' further providing for the filling of vacancies in certain circumstances.

*Consumer Party,* 507 A.2d at 325.

After several considerations, the bill was passed and referred to the House of Representatives for approval. While in the House, the bill was amended, but retained the same title. However, the Senate refused to concur in the amendments made by the House. Therefore, the bill was sent to a Committee of Conference where members of both chambers sought to achieve a compromise of the content of the bill. The version of the bill that was reported out of the Committee of Conference was **significantly** different than the original bill and was entitled:

An act establishing salaries and compensation of certain public officials including justices and judges of Statewide courts, judges of courts of common pleas, judge of the Philadelphia Municipal Court, judges of the Philadelphia Traffic Court, district justices and the Governor, the Lieutenant Governor, the State Treasurer, the Auditor General, the Attorney General and certain other State officers and the salary and certain expenses of the members of the General Assembly; and repealing certain inconsistent acts.

*Id.* at 326. On September 28, 1983, both chambers adopted the Committee's bill, and the bill was signed by then-Governor Thornburgh on September 30, 1983.

■ Subsequently, the Consumer Party commenced an action in this Court seeking to void Senate Bill 270 on the grounds that it violated Article III of the Pennsylvania Constitution. This Court sustained the Preliminary Objections of the Commonwealth.[2] This Court noted that "absent a clear violation of the Constitution, this Court will defer to the legislative judgment of the General Assembly." *Consumer Party,* 475 A.2d at 854. The Consumer Party appealed to our Supreme Court which affirmed our decision. The Supreme Court, citing its decision in *Scudder v. Smith,* discussed the purpose behind Article III, Section 1:

"The purpose of the constitutional requirements relating to the enactment of laws was to put the members of the [General] Assembly and others interested on notice . . . so they might vote on it with circumspection."

*Consumer Party,* 510 Pa. at 179, 507 A.2d at 334 (quoting *Scudder v. Smith,* 331 Pa. 165, 170–71, 200 A. 601, 604 (1938)). Thus, the principle behind Article III, Section 1, and indeed, Section 3 of that same article, is to ensure that interested parties, and especially members of the General Assembly charged with representing the citizens of the Commonwealth, are on notice of the contents of a bill and are not misled by the title or general contents of a bill. Thus, at bedrock, these two sections of Article III ensure that those charged with representing the citizens of the Commonwealth know the type and content of legislation for which they are voting. In *Consumer Party,* our Supreme Court noted that, although Senate Bill 270 had been "gutted," its title still fairly represented the contents of the bill and the legislators knew what was being voted on. The Court noted that

---

2. *See Consumer Party of Pennsylvania v. Commonwealth,* 81 Pa.Cmwlth. 609, 475 A.2d 850 (Pa.Cmwlth.1984), *aff'd,* 510 Pa. 158, 507 A.2d 323 (1986).

**14**

"The Consumer Party does not allege that any members were deceived as to the contents of the bill, making them unable to vote on it with circumspection. There is no submission by the Consumer Party that any part of the measure was secret."

*Consumer Party*, 510 Pa. at 181, 507 A.2d at 335 (quoting *Consumer Party of Pennsylvania v. Commonwealth*, 475 A.2d at 854). Similarly, the Court noted that none "of the members voting against the bill did so because they were denied the opportunity of considering the measure before its passage." *Id.* Thus, the clear import of *Consumer Party* is that, absent confusion or deception as to the content of a bill, there is no clear violation of the Constitution.

■ In the present case, the title of House Bill 1509, printer's number 4282 appeared as follows:

AN ACT AMENDING TITLES 15 (CORPORATIONS AND UNINCORPORATED ASSOCIATIONS) AND 66 (PUBLIC UTILITIES) OF THE PENNSYLVANIA CONSOLIDATED STATUTES, PROVIDING FOR GENERATION CHOICE FOR CUSTOMERS OF ELECTRIC COOPERATIVES AND UTILITIES; FURTHER PROVIDING FOR DEFINITIONS; REENACTING PROCEDURAL REQUIREMENTS FOR TAXICAB CERTIFICATES AND MEDALLIONS; PROVIDING FOR RESTRUCTURING OF THE ELECTRIC UTILITY INDUSTRY; AND FURTHER PROVIDING FOR TAXATION.

From its title, the contents of the Bill were absolutely clear. Therefore, as in *Consumer Party*, we conclude that no clear constitutional violation occurred in the present case because it is clear that the Senators and Representatives were not mislead by the bill's title and that they were on notice as to the Bill's content.[3]

■ As to Count II of Senator Fumo's Petition for Review which alleges that the Bill encompassed more than one subject, we are equally unconvinced that any clear viola-

tion of the Constitution occurred. As the *Consumer Party* Court noted:

The practice of sending legislation to a conference committee is by its nature designed to reach a consensus. . . . It is therefore to be expected that the legislation that emerges from such a process may materially differ from the bills sent to the Committee for consideration. To unduly restrict this process would inhibit the democratic process in its traditional method of reaching accord and would unnecessarily encumber the heart of the legislative process, which is to obtain a consensus.

*Consumer Party*, 507 A.2d at 334. Clearly, in the present case, that is what was done. The Senate amended the original bill which proposed to amend the Public Utility Code and added further amendments to that Code to expand different aspects of public utility regulation. It is readily apparent that, if our Supreme Court concluded that a bill that was totally changed in the Committee of Conference does not offend Article III of the Constitution, we must reach a similar conclusion in regard to the present Bill which involves amendments to the Public Utility Code and related subjects dealing with public utility regulation. Accordingly, we conclude that no obvious constitutional violations occurred in the enactment process of House Bill 1509.

■ The third alleged violation of Article III is that the House of Representatives did not consider the amendments to the Bill on three separate occasions. However, as the Respondents correctly point out, a violation of Article III, Section 4 is directly tied to a violation of Article III, Section 1, which prohibits legislation encompassing more than one subject. *See Parker v. Commonwealth*, 115 Pa.Cmwlth. 93, 540 A.2d 313 (Pa.Cmwlth. 1988), *aff'd per curiam*, 521 Pa. 531, 557 A.2d 1061 (1989). Thus, because we have concluded that the Bill did not violate the one subject requirement, we must also conclude that Article III, section 4 was not violated— that is, because House Bill 1509 was initially considered on three different days in the House and on three different days in the

---

3. Moreover, although not reaching the merits in this case, we note that several amendments to the bill were offered during debate on the senate floor, including one from Senator Fumo. *See Pennsylvania Legislative Journal—Senate*, Nov. 25, 1996, 2669, 2674–703.

Senate, it passed constitutional muster even though the Senate amendments themselves did not receive a separate three days of consideration in the House of Representatives. When either the House or the Senate places amendments to legislation emanating in the other chamber, those amendments do not constitutionally require another separate three days of separate consideration. If it were otherwise, any amendment to any bill which was adopted on third consideration and final passage in either chamber would require at least another two days of consideration even in that chamber alone, and any subsequent amendment would require the same reconsideration. It is obvious, of course, that the amendments which were inserted by the Committee of Conference in *Consumer Party* were not so encumbered and that those amendments were subsequently considered by each respective chamber only for one additional vote. Again, if it were otherwise and both chambers were constitutionally required to consider the conference amendments on three separate days, the entire legislative process would be bogged down to a snail-paced process.

Accordingly, we sustain the PUC's Preliminary Objections and dismiss the Petition for Review with prejudice.

### ORDER

**AND NOW**, September 24, 1998, following argument on Respondent's preliminary objections and Petitioner's response thereto, Respondent's preliminary objections in the above-captioned matter are hereby sustained and the Petition for Review is dismissed with prejudice.

COLINS, President Judge, and PELLEGRINI, J., concur in the result only.

FLAHERTY, Judge, dissenting.

I respectfully dissent. Since the decision of our Supreme Court in *Consumer Party of Pennsylvania v. Commonwealth of Pennsylvania*, 510 Pa. 158, 507 A.2d 323 (1986), the Enrolled Bill Doctrine has lost its vitality in barring a court from examining whether the procedures of the legislature in enacting legislation comport with the provisions of the Constitution of this Commonwealth, as illustrated by the analysis of that case, as well as by subsequent cases which this court has decided. Because the Enrolled Bill doctrine has lost its vitality and the Majority purportedly applies this doctrine in the instant case, I must dissent.

The history of the matter at issue is correctly stated at length in the majority opinion.

A two-page bill was passed unanimously by the House and sent to the Senate to amend the Public Utility Code by increasing from six to eight years the maximum time that a taxicab could be operated. One and a half years later in the Senate, the bill was amended to include 84 additional pages deregulating the generation of electricity in the entire Commonwealth of Pennsylvania. Although the bill, as amended, did not resemble the taxicab life support system bill, the House concurred in the amendments and the Governor signed the bill.

Petitioners challenged as unconstitutional the enactment of the bill on three grounds:

(1) The bill was so altered that the original purpose was changed; and

(2) The bill contained more than one subject which was not clearly expressed in its title; and

(3) The bill was not considered on three different days in each house.

The majority, relying basically upon the Enrolled Bill Doctrine, has now stretched it beyond the constitutional breaking point by sustaining the preliminary objections and dismissing Petitioners' challenge with prejudice.

An "enrolled bill" is a "bill which has been duly introduced, finally passed by both houses, signed by the proper officers of each, approved by the governor (or President) and filed by the secretary of state." Black's Law Dictionary, 530 (6 [th]ed.1990). The "Enrolled Bill Doctrine" provides that "[w]hen a law has been finally passed and approved and certified in due form, it is no part of the judiciary to go behind the law as duly certified to inquire into the observance of form in its passage." *Pennsylvania School Boards Association, Inc. v. Commonwealth Associa-*

*tion of School Administrators,* 696 A.2d 859, 870, (Pa.Cmwlth.1997), *appeal dismissed,* 550 Pa. 228, 704 A.2d 631 (1998), *quoting, Kilgore v. Magee,* 85 Pa. 401, 412 (1877). In other words, a court cannot look at the proceedings utilized in the legislature to pass a law.

The Enrolled Bill Doctrine has an evidentiary component. The Enrolled Bill Doctrine essentially prevents any evidence from coming into court to impeach the constitutionality of an enrolled bill on the basis that the legislature did not comply with the procedures mandated by the Constitution. *See Mikell v. School District of Philadelphia,* 359 Pa. 113, 126, 58 A.2d 339, 346 (1948)("the enrolled bill is the conclusive evidence of statutory enactment and no other evidence is admissible to establish that the bill was not lawfully enacted.") Thus, when a litigant comes to court to challenge the constitutionality of a law on the basis that the legislature did not observe the proceedings mandated by the Constitution in the passing of the bill, the defenders of the law need only produce the certified enrolled bill to bring an end to the suit. Thus, the Enrolled Bill Doctrine prohibited the courts from entering into any inquiry as to whether the legislature complied with the procedural mandates of the Constitution of this Commonwealth in passing legislation.

The Enrolled Bill Doctrine is a *judicially* crafted rule of deference to the legislature, a co-equal branch of government. Harry L. Witte, *Judicial Selection in the People's Democratic Republic of Pennsylvania: Here The People Rule?,* 68 Temple Law Rev. 1079 (Fall, 1995). The Enrolled Bill Doctrine was intended to give effect to the separation of powers. *See, e.g., Velasquez v. Depuy,* 46 Pa. D. & C.2d 587, 594–601 (1969). Our Supreme Court has stated that because the Enrolled Bill Doctrine was intended

> [t]o preserve the delicate balance critical to a proper functioning of a tripartite system of government, this Court has exercised restraint to avoid an intrusion upon the prerogatives of a sister branch of government. Pursuant to this principle we have rejected challenges to the procedural regularity of the passage of legislation that has been passed and approved in due form

on the grounds that the matter is non-justiciable.

*Consumer Party,* 510 Pa. at 176–77, 507 A.2d at 332. However, there is a countervailing interest, namely that the courts must assure that the Constitution is not violated. As our Supreme Court observed:

> [t]he countervailing concern is our mandate to insure that government functions within the bounds of constitutional prescription. [citations omitted] We may not abdicate this responsibility under the guise of our deference to a co-equal branch of government. While it is appropriate to give due deference to a co-equal branch of government as long as it is functioning within constitutional constraints, it would be a serious dereliction on our part to deliberately ignore a clear constitutional violation.

*Consumer Party,* 510 Pa. at 177–78, 507 A.2d at 333.

The procedures mandated by Article III, Sections §§ 1–4 were inspired by legislative abuses prevalent at the time of the adoption of the Constitution of 1874. *See, e.g.,* Robert Williams, *Statutory and Constitutional Interpretation: State Constitutional Limits on Legislative Procedure: Legislative Compliance and Judicial Enforcement,* 48 U. Pitt. L.Rev. 797, 810–811 (Spring 1997) ("Legislative abuses led to the specific limitations on legislative procedure inserted into the Pennsylvania Constitution in 1874.").

Accordingly, our Supreme Court noted that "Section 1 of Article III, as well as the other provisions adopted in 1874 to prevent legislative corruption, have served well in achieving that objective." *Consumer Party,* 510 Pa. at 178, 507 A.2d at 333. Hence, because of the Supreme Court's concern that the Enrolled Bill Doctrine would emasculate these safeguards against legislative abuses in the process of passing legislation, the Supreme Court implicitly rejected the Enrolled Bill doctrine in *Consumer Party.* The Supreme Court stated that "[t]o adopt a blanket doctrine of abstention [pursuant to the Enrolled Bill Doctrine] as suggested by the Attorney General, a position to some extent supported by early case law, would erode the safeguard that has been erected and invite

the evils that the Constitution of 1874 was designed to eradicate." *Consumer Party,* 510 Pa. at 178, 507 A.2d at 333 (footnote omitted).

Thus, the Supreme Court, in *Consumer Party,* rejected the earlier case law that struck a balance in favor of absolute deference to the legislature by giving effect to the Enrolled Bill Doctrine, which precluded courts from going behind the enrolled bill and examining the legislature's compliance with the constitutionally required procedures. "The Court's holding in *Consumer Party* signifies a rejection of its prior pattern of strict adherence to the enrolled bill rule." David B. Snyder, Note, *The Rise and the Fall of the Enrolled Bill Doctrine in Pennsylvania,* 60 Temple Law Q. 315, 326 (1986). In *Consumer Party,* the Supreme Court struck the balance in favor of assuring that the Constitution would be complied with: "[w]hen the Constitution clearly sets forth the manner in which something shall be done, that procedure must be followed to the exclusion of all others, including a procedure which the legislature may prefer." *Consumer Party,* 510 Pa. at 179, 507 A.2d at 333, *quoting, School Districts of Deer Lakes and Allegheny v. Kane,* 463 Pa. 554, 564, 345 A.2d 658, 663 (1975) (footnote omitted by the *Consumer Party* Court).

The Court in *Consumer Party* did indicate that judicial abstention is a matter of some discretion: "the legitimacy of the abstention is dependent upon the situation presented." *Id.* at 177, 507 A.2d at 333. The criteria for which situations warrant abstention and which warrant judicial scrutiny were not clearly set forth in *Consumer Party,* but the Supreme Court did provide the following guidelines. The Supreme Court stated that "where the facts are agreed upon and the question presented is whether or not a violation of a mandatory constitutional provision has occurred, it is not only appropriate to

provide judicial intervention, and if warranted a judicial remedy, we are mandated to do no less." *Id.* at 180, 507 A.2d at 334. Thus, it would appear that there are two criteria for when the courts should provide judicial scrutiny rather than adhere to the Enrolled Bill Doctrine: 1) when there is no factual dispute or when the facts are agreed upon and 2) when the issue is whether mandatory constitutional provisions have been violated.

However, it does not seem reasonable to me that the Supreme Court meant to make the judiciary's function of assuring that the Constitution is complied with dependent upon the mere happenstance of whether or not the parties to a particular suit stipulate to the facts. That so critical a function of the judiciary as deciding that the Constitution is being violated would depend upon the whim and caprice of parties borders on the incredulous. And, in fact, this court has, on occasion, and without regard to the application of the Enrolled Bill Doctrine, inquired into whether or not the legislature complied with the Constitution's procedural requirements even in the absence of a stipulation of facts. *See, e.g., Pennsylvania AFL–CIO by George v. Commonwealth,* 683 A.2d 691 (Pa.Cmwlth. 1996). *See also Common Cause/Pennsylvania v. Commonwealth,* 710 A.2d 108, 116 (Pa.Cmwlth.1998) (*en banc); Pennsylvania AFL–CIO v. Commonwealth,* 691 A.2d 1023, 1026 (Pa.Cmwlth.1997).

Thus, the real criterion for determining whether or not a court should apply the Enrolled Bill Doctrine is dependent upon whether the suit raises the issue of a violation of mandatory constitutional provisions. *Cf. League of Women Voters v. Commonwealth,* 683 A.2d 685, 689 (Pa.Cmwlth.1996)(Enrolled Bill Doctrine bars court from entering into inquiry concerning violations of the Sunshine Act, because such are only violations of a statute and not of the Constitution).[1]

---

1. Even if *Consumer Party* does require that there be no factual dispute before a court can entertain a challenge to the legislature's compliance with mandatory provisions of the Constitution, given the procedural posture of this suit at this point in time, *i.e.,* deciding preliminary objections in the nature of a demurrer, there is no factual dispute. When deciding preliminary objections in the na-

ture of a demurrer we accept as true all well plead facts in the complaint and decide on the basis of those facts whether the law says with certainty that there can be no relief. *Stilp v. Commonwealth,* 699 A.2d 1353 (Pa.Cmwlth. 1997). Thus, for purposes of this case, I find that the facts as alleged in the petition for review must be accepted as true and therefore there is

Indeed, *Consumer Party* sounded the death knell of the Enrolled Bill Doctrine in this Commonwealth insofar as it relates to suits raising violations of mandatory provisions of the Constitution. For, while the Supreme Court noted that the doctrine is discretionary and to be applied only in some instances, it is nevertheless necessary to make a determination about whether or not in any particular situation the court is to apply the doctrine in that situation. It seems obvious to me that in making this determination, the court will obviously have to consider the facts of that particular situation in order to decide whether or not those particular facts merit judicial inquiry. However, once the court embarks upon inquiring into the procedures utilized by the legislature to pass the bill to determine if those facts merit judicial inquiry, the Enrolled Bill Doctrine, which purports to bar such an inquiry, has already been rejected.

Therefore, if we are to comply with *Consumer Party*, we must, of necessity, abandon the Enrolled Bill Doctrine and enter into an inquiry as to the facts surrounding the case so as to determine whether or not in this given set of facts, we should go further. Prior to *Consumer Party*, courts confronted with allegations of legislative violations of constitutionally mandated procedures would simply refuse to look at the facts of the case, relying upon the Enrolled Bill Doctrine. Now, under the regime of *Consumer Party*, the courts will look to the facts of the case and after giving deference to the legislative branch via the presumption of constitutionality of its acts, the courts will decide whether those acts violated the Constitution.

It is true that cases decided after *Consumer Party* purport to apply the Enrolled Bill Doctrine. However, upon close examination of those cases, it becomes apparent that the courts are not applying the Enrolled Bill

Doctrine because, in the course of their opinions, the courts actually look behind the enrolled bill and examine the legislature's acts underlying the passage of the bill. *See, e.g., League of Women Voters v. Commonwealth,* 692 A.2d 263, 273 (Pa.Cmwlth.1997)(the court took judicial notice of legislative journals as well as various versions of the Senate Bill in that case, thus looking behind the enrolled bill and yet concluded that "judicial scrutiny of petitioners' constitutional claims is barred by the Enrolled Bill doctrine.").

Indeed the Majority's opinion is an excellent example of this very situation. While purporting to find the issues raised in Senator Fumo's Petition for Review non-justiciable, the court nevertheless concludes, regarding count one, that "no clear constitutional violation occurred in the present case" (Majority opinion at p. 14); regarding count two, that "no obvious constitutional violations occurred in the enactment process of House Bill 1509" (*id.* at 14); and regarding count three, "Article III, section 4 was not violated" (*id.*).

When a question is non-justiciable, it means that the court cannot answer the question. Here, while saying that we find the questions raised by Senator Fumo's Petition for Review non-justiciable, we nevertheless answer those questions, finding that there were no violations of the Constitution. We cannot have it both ways. Either the questions raised are non-justiciable which means we must dismiss the petition out of hand, invoking the now-rejected Enrolled Bill Doctrine, or, admit that pursuant to *Consumer Party*, the questions are justiciable and that we find no merit to them, because, even accepting as true all of the allegations in the Petition for Review, they do not constitute violations of the constitutional provisions.[2]

no factual dispute. Hence, to the extent *Consumer Party* requires no factual dispute as a predicate to a court's entertaining a challenge to the legislature's compliance with the Constitution, I would find that requirement met in this case. In other words, for the purposes of deciding the preliminary objections in the nature of a demurrer, the facts as alleged in the petition for review are analogous to a stipulation of facts.

2. The ability of an appellate court to examine the three questions Senator Fumo raises before us is clearly justiciable and, other states have not only entered into the inquiry, but upon review, have dared to find similarly passed legislation unconstitutional.

In, *Advisory Opinion of the Justices, No. 331,* 582 So.2d 1115 (Al.1991), the Alabama Supreme Court held that House Bill No. 204, as amended and substituted, violated sections 61, 45 and 71

Because the Majority purports to apply the Enrolled Bill Doctrine which was rejected in *Consumer Party* to a suit, involving alleged infractions of mandatory constitutional provisions, finding the issues to be nonjusticiable, but then goes on to address the questions raised and concludes that there were no infractions, I must dissent.

FRIEDMAN, J., joins in this dissent.

of the Constitution of Alabama of 1901 because the bill was altered and amended during its passage through the legislature such that it changed its original purpose, that the Bill provided legislation on more than one subject, and that the title of the Bill did not fairly reflect the content.

Where section 61 of the Alabama Constitution of 1901 provides in part that "no bill shall be so altered or amended on its passage through either house as to change its original purpose," the Supreme Court of Alabama held that, "the Bill's original purpose [was changed] from one of making general appropriations to the various departments and agencies of state government to one of making appropriations, but also repealing and changing other provisions of law that grant to the various state departments and agencies powers to hire necessary employees and to make necessary equipment purchases." 582 So.2d at 1117.

Where section 45 of the Alabama Constitution of 1901 provides, in part that, "each law shall contain but one subject, which shall be clearly expressed in its title," the Supreme Court of Alabama determined that, among the many important purposes for this clause is, "first, to prevent hodgepodge or logrolling legislation; second, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles give no intimation, and which might, therefore, be overlooked and carelessly and unintentionally adopted; and third, to fairly apprise the people of the subjects of legislation that are being considered in order that they may have an opportunity of being heard thereon, by petition or otherwise, if they so desire. And, ... no one of these purposes is no [sic] more important the other." 582 So.2d at 1119.

Other states have recognized the justiciability of this particular inquiry and have either followed this Alabama precedent or have undertaken to examine the constitutionality of similarly passed legislation on their own. *See also, National Solid Waste Management Association, et al., v. Director of the Department of Natural Resources,* 964 S.W.2d 818 (Mo.1998)(where the Supreme Court of Missouri declared unconstitutional legislation whose original purpose and single subject was "solid waste management," but which was amended two days before the end of the 1995 legislative session, and tacked onto a 31 page senate bill the additional regulation of "hazardous waste facilities", as violating the constitutional provision requiring that each bill shall contain no more than one subject which shall be clearly expressed in its title, declaring that even that minute difference so clearly violated the constitution as to constitute a "fatal defect" in the legislation.); *St. Louis Health Care Network, et al., v. State of Missouri, et al.,* 968 S.W.2d 145 (Mo.1998)(where the Missouri Supreme Court held that House Substitute for Senate Bill 768 [HSSB 768] held that the title of HSSB 768 violates the clear title mandate of article III, section 23 of the Missouri Constitution for failing to express clearly a single subject and was, therefore, unconstitutional.); and *Theodore "Ted" Jones v. Board of Ethics, et al.,* 605 So.2d 1064 (La.1992)(where the Court found the question justiciable, and upon review of the constitutionality of the manner in which the bill was amended, found it to be constitutional, *citing Opinion of the Justices No. 331* ).