Daylin LEACH, Minority Chairman of the Senate Judiciary Committee and Senator Representing the 17th Senatorial District, Vincent J. Hughes, Senator Representing the 7th Senatorial District, Lawrence M. Farnese, Senator Representing the 1st Senatorial District, Cherelle L. Parker, Representative for the 200th House District, Edward C. Gainey, Representative for the 24th House District, the City of Philadelphia, the City of Pittsburgh, and the City of Lancaster, Petitioners

v.

COMMONWEALTH of Pennsylvania, Mike Turzai, Speaker of the House of Representatives, James F. Cawley,

Lieutenant Governor of the Commonwealth of Pennsylvania, and Thomas Wingett Corbett, Governor of the Commonwealth of Pennsylvania, Respondents.

Commonwealth Court of Pennsylvania.

Argued April 15, 2015.

Decided June 25, 2015.

Robert L. Masterson, Philadelphia, for petitioners.

Gregory E. Dunlap, Harrisburg, and Nicholas M. Orloff, Media, for respondents.

BEFORE: DAN PELLEGRINI, President Judge, BERNARD L. McGINLEY, Judge, BONNIE BRIGANCE LEADBETTER, Judge, ROBERT SIMPSON, Judge, MARY HANNAH LEAVITT, Judge, PATRICIA A. McCULLOUGH, Judge, and ANNE E. COVEY, Judge.

OPINION BY Judge ROBERT SIMPSON.

In this original jurisdiction matter, we are confronted with a facial state constitutional challenge to Act No. 192 of 2014 (Act 192). Act 192 began as a two-page bill establishing criminal penalties for the theft of secondary metals. In the final stages of enactment, it became an act that also created a civil cause of action for a broad class of individuals and organizations seeking to challenge municipal firearm legislation, and it authorized an award of attorney fees to successful challengers in the newly-created civil action. At issue is the regularity of procedures employed by the General Assembly in enacting Act 192.

Specifically, five members of the General Assembly[1] and the Cities of Philadelphia, Pittsburgh and Lancaster (collectively, Petitioners) filed a petition for review in the nature of a complaint in equity (complaint) in this Court seeking to enjoin the Commonwealth from enforcing any provisions of or taking any action in accordance with Act 192, and to declare Act 192 unconstitutional and void. Two members of the General Assembly[2] (Legislative Respondents) filed preliminary objections seeking dismissal of the suit. Petitioners subsequently filed a Motion for Summary Relief and Entry of Judgment Pursuant to Pa. R.A.P. 1532(b). For the reasons set forth below, we grant Petitioners' motion for summary relief, and we declare Act 192 unconstitutional and void. As a result, we dismiss Legislative Respondents' preliminary objections as moot.

## I. Background

Through their complaint, Petitioners aver that Act 192 began as House Bill No. 80 (HB 80) and was entitled "AN ACT Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, defining the offense of theft of secondary metal; and prescribing penalties." Compl. at ¶ 19; Ex. A. The original purpose of the bill was to create criminal penalties for the theft of secondary metals, such as copper and aluminum. Compl. at ¶ 20. The two-page bill had four subsections, a definition of the offense, grading for the offense, a penalty for repeat offenders and a definition of "secondary metal." *Id.*; Ex. A. According to the bill's prime sponsor, HB 80 was introduced for the purpose of combatting the theft of copper wiring and other scrap metals used in business, and the consequent disruption of business and utility supply, as well as revenue losses. Compl. at ¶ 21; Ex. B. HB 80 underwent a minor technical amendment in the House Judiciary Committee. Compl. at ¶ 23; Ex. C. The House then passed HB 80 by an overwhelming vote of 197 to 2. Compl. at ¶ 25.

HB 80 was sent to the Senate where it underwent two relatively minor amendments; however, the purpose of the bill

1. Those members are: Daylin Leach, Minority Chairman of the Senate Judiciary Committee and Senator Representing the 17th Senatorial District; Vincent J. Hughes, Senator Representing the 7th Senatorial District; Lawrence M. Farnese, Senator Representing the 1st Senatorial District; Cherelle L. Parker, Representative for the 200th House District; and, Edward C. Gainey, Representative for the 24th House District.

2. The preliminary objections were initially filed by former Speaker of the House of Representatives Samuel H. Smith, and former

Lieutenant Governor James F. Cawley. When Mike Turzai took office as Speaker of the House he was automatically substituted for former Speaker Smith. Additionally, this Court granted the application for leave to intervene of Joseph B. Scarnati, President Pro Tempore of the Senate, who joins in Speaker Turzai's preliminary objections. Also, when Lieutenant Governor Michael J. Stack, III took office he was automatically substituted for former Lieutenant Governor Cawley. Lieutenant Governor Stack does not join in the preliminary objections.

did not change. Compl. at ¶¶ 26–30. It was limited to the subject of creating criminal penalties for the theft of secondary metal. *Id.*

While HB 80 was proceeding through the General Assembly, a distinct and unrelated bill, HB 1243, was also under consideration. Compl. at ¶ 31. In April 2013, HB 1243 was introduced into the General Assembly and referred to the House Committee on the Judiciary as HB 1243, PN 1585. Compl. at ¶ 32. The bill was entitled "AN ACT Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, in firearms and other dangerous articles, further providing for persons not to possess, use, manufacture, control, sell or transfer firearms and for Pennsylvania State Police." Compl. at ¶ 33; Ex. F. The bill included an amendment to 18 Pa.C.S. § 6111.1(f), a statute that governs the responsibility of the Pennsylvania State Police to provide "[n]otification of mental health adjudication, treatment, commitment, drug use or addiction," to federal authorities. Compl. at ¶ 34; Ex. F. The amendment made mandatory the disclosure "to the United States Attorney General or a designee, any record relevant to a determination of whether a person is disqualified from possessing or receiving a firearm[.]" Compl. at ¶ 34; Ex. F. at 4–5.

In September 2014, the House amended HB 1243, resulting in HB 1243, PN 4179, "to add the provision at the core of this dispute, an amendment to Section 6120 of the Crimes Code, 18 Pa.C.S. § 6120, granting sweeping new rights to gun advocates to enter the courts and challenge municipal legislation." Compl. at ¶ 35; Ex. G. Section 6120, entitled "Limitation on the regulation of firearms and ammunition," states that counties, municipalities and townships may not "in any manner regulate the lawful ownership, possession, transfer or transportation of firearms, ammunition or ammunition components when carried or transported for purposes not prohibited by the laws of this Commonwealth." Compl. at ¶ 36. HB 1243, PN 4179 contained several provisions that would grant gun advocates a right of action against municipalities and would mandate an award of attorney fees upon rescission or repeal of the ordinance in question or final determination. Compl. at ¶ 38. It stated:

SECTION 2. SECTION 6120(B) OF TITLE 18 IS AMENDED AND THE SECTION IS AMENDED BY ADDING SUBSECTIONS TO READ:

§ 6120. LIMITATION ON THE REGULATION OF FIREARMS AND AMMUNITION.

* * *

*(A.2) RELIEF.—A PERSON ADVERSELY AFFECTED BY AN ORDINANCE, A RESOLUTION, REGULATION, RULE, PRACTICE OR ANY OTHER ACTION PROMULGATED OR ENFORCED BY A COUNTY, MUNICIPALITY OR TOWNSHIP PROHIBITED UNDER SUBSECTION (A) OR 53 PA.C.S. § 2962(G) (RELATING TO LIMITATION ON MUNICIPAL POWERS) MAY SEEK DECLARATORY OR INJUNCTIVE RELIEF AND ACTUAL DAMAGES IN AN APPROPRIATE COURT.*

*(A.3) REASONABLE EXPENSES.—A COURT SHALL AWARD REASONABLE EXPENSES TO A PERSON ADVERSELY AFFECTED IN AN ACTION UNDER SUBSECTION (A.2) FOR ANY OF THE FOLLOWING:*

*(1) A FINAL DETERMINATION BY THE COURT IS GRANTED IN FAVOR OF THE PERSON ADVERSELY AFFECTED.*

*(2) THE REGULATION IN QUESTION IS RESCINDED, RE-*

*PEALED OR OTHERWISE ABRO-GATED AFTER SUIT HAS BEEN FILED UNDER SUBSECTION (A.2) BUT BEFORE THE FINAL DETERMINATION BY THE COURT.*

Compl. at ¶ 38; Ex. G. In turn, the legislation defined "reasonable expenses" as follows:

*"REASONABLE EXPENSES." THE TERM INCLUDES, BUT IS NOT LIMITED TO, ATTORNEY FEES, EXPERT WITNESS FEES, COURT COSTS AND COMPENSATION FOR LOSS OF INCOME.*

Compl. at ¶ 39.

The legislation also contained a provision defining "person adversely affected" for standing purposes:

*"PERSON ADVERSELY AFFECTED." ANY OF THE FOLLOWING:*

*(1) A RESIDENT OF THIS COMMONWEALTH WHO MAY LEGALLY POSSESS A FIREARM UNDER FEDERAL AND STATE LAW.*

*(2) A PERSON WHO OTHERWISE HAS STANDING UNDER THE LAWS OF THIS COMMONWEALTH TO BRING AN ACTION UNDER SUBSECTION (A.2).*

*(3) A MEMBERSHIP ORGANIZATION, IN WHICH A MEMBER IS A PERSON DESCRIBED UNDER PARAGRAPHS (1) OR (2).*

Compl. at ¶ 40.[3]

The House passed HB 1243 in early October 2014, and sent it to the Senate, where it was assigned to the Senate Judiciary Committee. Compl. at ¶ 42. HB 1243 ultimately died in committee. *Id.*

With HB 1243 stalled in committee, and the last voting day of the legislative session set for October 15, 2014, the Senate adopted Amendment A10397, which merged language from HB 1243 into HB 80. Compl. at ¶¶ 43–45. Following passage of Amendment A10397, HB 80 became HB 80, PN 4318, Regular Session of 2013–14, as Amended on Third Consideration, in Senate, October 15, 2014. Compl. at ¶ 46. This final version of HB 80 was given a new title:

Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, in burglary and other criminal intrusion, further providing for the offense of criminal trespass; defining the offense of theft of secondary metal; and prescribing penalties; and, in firearms and other dangerous articles, further providing for Pennsylvania state police and for limitation on the regulation of firearms and ammunition.

Compl. at ¶ 47; Ex. I.

The Senate added two new sections to HB 80, the first of which, Section 3, amended 18 Pa.C.S. § 6111.1, a provision relating to the obligations of the Pennsylvania State Police to provide notification of "mental health adjudication, treatment, commitment, drug use or addiction," and provided for disclosure of any record relevant to a determination of whether a person is not disqualified or no longer disqualified from possessing or receiving a

---

**3.** Petitioners aver:

Courts have held that, without a showing of aggrievement, gun advocates and membership organizations such as the National Rifle Association lack standing to bring suits challenging local ordinances on the ground that the ordinances violate 18 Pa.C.S. § 6120. *See Nat'l Rifle Ass'n v. City of Philadelphia*, 977 A.2d 78, 81–82 [(Pa.Cmwlth.2009)] (NRA lacks standing to challenge the City's "Imminent Danger Ordinance," "Protection From Abuse Ordinance," and "Lost or Stolen Gun Ordinance"); *Nat'l Rifle Ass'n v. City of Pittsburgh*, 999 A.2d 1256 [(Pa.Cmwlth.2010)] (same, for lost or stolen firearms ordinance). Upon information and belief, the amendments to HB 1243 were made in an attempt to overturn these decisions.
Compl. at ¶ 37.

firearm. Compl. at ¶ 48; Ex. I. The text was taken verbatim from the stalled HB 1243, PN 4179. Compl. at ¶ 48. The second of the two new sections the Senate added to HB 80, Section 4, amended 18 Pa.C.S. § 6120, adding new subsections (a.2), (a.3), and amended subsection (b) to create a new civil right of action to "a person adversely affected" by certain ordinances, regulations, rules, practices, or other actions promulgated or enforced by a county, municipality, or township and to grant standing in the courts of the Commonwealth to bring the new civil action to individuals eligible to own a firearm and to "membership organizations" with even just a single such eligible member. Compl. at ¶ 49. Except for the correction of the word "paragraphs" to "paragraph," the text of this section is identical to the text included in Section 2 of the stalled HB 1243, PN 4179. *Id.*

As amended, HB 80's contents included legislation relating to:

(a) Criminal penalties for theft of secondary metal (Compl., Ex. I at 1–4);

(b) Disclosure and expungement of mental health records by the Pennsylvania State Police (*id.* at 4–5);

(c) Creation of a civil right of action against municipalities (*id.* at 5);

(d) Providing standing to a new class of firearm owners, eligible residents and "membership organizations" (*id.* at 6); and,

(e) Providing for attorney fees to a prevailing plaintiff (*id.*).

Compl. at ¶ 50; Ex. I.

The Senate passed the final version of the bill the next day, October 16, 2014, and returned it to the House. Compl. at ¶ 52. The Senate then adjourned. *Id.* The House concurred in the Senate amendments, passed the bill on October 20, 2014, and then adjourned. Compl. at ¶ 53. The vote on HB 80 was the very last legislative act of the House before adjournment. *Id.*

"As part of the rush to enact HB 80 before the election," Samuel H. Smith, then presiding officer of the House of Representatives, signed what he believed was the official version of the bill in the House on October 20, 2014. Compl. at ¶ 54. As Speaker Smith later explained to the Governor in his letter of November 5, 2014, the document he signed and passed along to the President of the Senate was, in fact, not the bill the House and Senate passed, but rather "the wrong printer's number, PN 4248," representing a previous version of the bill that only included the secondary metal provisions. Compl. at ¶ 55; Ex. K. The President Pro Tempore of the Senate, as its presiding officer, signed the incorrect bill in the Senate on October 22, 2014. Compl. at ¶ 56. The President Pro Tempore failed to notice the bill was not the bill the Senate passed. *Id.*

In late-October 2014, then-Governor Tom Corbett signed HB 80; however, the version of the bill the Governor signed actually addressed only the subject of theft of secondary metal. Compl. at ¶ 57; Ex. L.

On November 5, 2014, the House of Representatives reconvened on short notice, and Speaker Smith, as the presiding officer of the House, signed the version of the bill the House actually passed. Compl. at ¶ 58. The next day, then-Lieutenant Governor James F. Cawley, as the presiding officer of the Senate, opened a Senate session and signed the version of HB 80 the Senate passed. Compl. at ¶ 59. The Governor signed HB 80, PN 4318 on November 6, 2014, and it is now known as Act 192. Compl. at ¶ 60. By its terms, Act 192 became effective 60 days after the Governor's signature, on January 5, 2015. Compl. at ¶ 61.

Shortly after the Governor signed HB 80, PN 4318, Petitioners filed their complaint seeking declaratory and injunctive

relief, alleging violations of the Pennsylvania Constitution, Article III, Section 1 (original purpose) and Section 3 (single subject).

In response, Legislative Respondents filed preliminarily objections, challenging the legal sufficiency of the complaint.[4] Petitioners subsequently filed a motion for summary relief, seeking a declaration that Act 192 violates Article III, Sections 1 and 3, and, therefore, is unconstitutional and void. The parties' cross-dispositive motions are now before us for disposition.[5]

## II. Discussion

### A. Contentions

In support of their motion for summary relief, Petitioners[6] argue that in its semi- nal decision in *City of Philadelphia v. Commonwealth,* 575 Pa. 542, 838 A.2d 566 (2003), the Pennsylvania Supreme Court made clear that the legislative branch must abide by the single subject and original purpose provisions of the Pennsylvania Constitution. Petitioners assert Act 192 violates both of these requirements because the law began as a bill setting penalties for the theft of secondary metals, but was passed with unrelated legislation granting rights of standing to gun membership organizations and regulating mental health records. Petitioners maintain Act 192 reaches far beyond the original uncontroversial purpose of HB 80 and seeks to invade the province of the courts by changing traditional notions of ag-

4. Respondent Commonwealth of Pennsylvania also filed preliminary objections, asserting it is immune from suit. Respondent former Governor Tom Corbett filed preliminary objections on the ground that Petitioners stated no cognizable claim against the Governor. When Governor Tom Wolf took office in January 2015, he was automatically substituted for Governor Corbett. Thereafter, the parties filed a stipulation of discontinuance in which they agreed to discontinue this matter as to the Commonwealth and the Governor only. We approved this stipulation by order of May 12, 2015.

In addition, Respondent Lieutenant Governor Stack filed a motion for summary relief, asserting that because Petitioners state no cognizable claim against him and because he is not an indispensable or necessary party, this Court should summarily dismiss him from this case with prejudice. Petitioners filed a notice of non-response to the Lieutenant Governor's application for summary relief in which they indicated they would not file a response in opposition to the Lieutenant Governor's application for summary relief. We granted the Lieutenant Governor's application for summary relief by order of May 12, 2015.

5. Pursuant to Pa. R.A.P. 1532(b): "At any time after the filing of a petition for review in an ... original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." *Id.* An application for summary relief may be granted if a party's right to judgment is clear and no material issues of fact are in dispute. *Hosp. & Healthsystem Ass'n of Pa. v. Commonwealth,* 621 Pa. 260, 77 A.3d 587 (2013). "In ruling on a request for summary relief, the Commonwealth Court views the evidence in the light most favorable to the nonmoving party, and enters judgment only if there is no genuine issue as to any material fact and the right to relief is clear as a matter of law." *Id.* at 602. The summary relief standard under Pa. R.A.P. 1532(b) is similar to the summary judgment standard under the Pennsylvania Rules of Civil Procedure. *Id.*

As to preliminary objections in the nature of a demurrer, we may sustain preliminary objections only when, based on the facts pled, it is clear and free from doubt that the complainant will be unable to prove facts legally sufficient to establish a right to relief. *Mazur v. Trinity Area Sch. Dist.,* 599 Pa. 232, 961 A.2d 96 (2008). For the purpose of evaluating the legal sufficiency of the challenged pleading, the court must accept as true all well-pled, material, and relevant facts alleged in the complaint and every inference that is fairly deducible from those facts. *Id.*

6. Pennsylvania Coalition of Mayors Against Illegal Guns and Cease Fire PA filed briefs as *amici curiae* in support of Petitioners' motion for summary relief.

grievement as a prerequisite for standing. Petitioners contend Act 192 clearly and palpably violates the single subject and original purpose requirements of the Pennsylvania Constitution.

Legislative Respondents counter that Act 192 was enacted in compliance with Article III, Sections 1 and 3 of the Pennsylvania Constitution. They argue that Act 192 (which began as HB 80) was not so altered or amended during enactment in the General Assembly that its original purpose—to amend discrete provisions of the Crimes Code—was changed. According to Legislative Respondents, Act 192 has only one subject, it amends select and related provisions in the Crimes Code, and that subject is clearly expressed in its title.

Legislative Respondents maintain that Petitioners ask this Court to delve into dangerous territory. Specifically, Petitioners want this Court to question the General Assembly's policy choices in electing to amend various provisions of the Crimes Code. Legislative Respondents assert the purpose of Article III, which is to ensure legislation is voted on with circumspection, clearly was not compromised, as evidenced by the open and lively debate in both the Senate and House regarding the final version of Act 192. Legislative Respondents argue Petitioners are disappointed that their own firearms-related amendments to Act 192 were not adopted and are opposed to certain provisions of Act 192 that gained a majority vote in the House and Senate. They contend Petitioners are using the judiciary to gain a victory that they could not achieve in the legislature.

Legislative Respondents further assert that neither of Petitioners' constitutional challenges meets the legal standard necessary to overcome the strong presumption that Act 192 is constitutional. Thus, this Court should sustain Legislative Respondents' preliminary objections and deny Petitioners' motion for summary relief.

In reply, Petitioners assert that shortly after the January 5, 2015, effective date of Act 192, the Commonwealth erupted in litigation. They contend Petitioners Philadelphia, Pittsburgh, and Lancaster, as well as Harrisburg and other municipalities are now under assault by plaintiffs trying to avail themselves of Act 192's attorney fees and expanded standing provisions. Petitioners argue the litigation is an unnecessary drain on taxpayer and judicial resources, and it is urgent that this Court strike down the palpably unconstitutional Act 192.

Petitioners maintain that Legislative Respondents' brief addresses numerous peripheral matters in an attempt to bury the key issues in the case-whether criminalizing the theft of secondary metals and the firearms legislation form a single subject, and whether the dramatic shift in focus from one to the other represented an unchanged purpose. They assert the answer is "no" to both questions. As a result, Act 192 violates the single subject rule of Article III, Section 3, as well as the original purpose rule of Article III, Section 1.

Petitioners note that Legislative Respondents try to defend Act 192 by arguing it addresses the "single" subject of "amending the Crimes Code." According to Petitioners, Legislative Respondents might as well have argued that the subject was "amending legislation." In other words, the proffered subject matter is far too broad to withstand constitutional scrutiny.

Petitioners further contend Legislative Respondents do not address key arguments in Petitioners' brief and brazenly rely on cases decided under a prior, more lenient standard. Despite these attempts at misdirection, Legislative Respondents cannot hide the fact that the process through which Act 192 became law violates basic principles of good government and,

indeed, the Pennsylvania Constitution. Thus, Petitioners ask this Court to uphold the primacy of the Pennsylvania Constitution and strike down Act 192.

## B. Analysis

"In conducting our review, we are guided by the principle that 'acts passed by the General Assembly are strongly presumed to be constitutional, including the manner in which they were passed.'" *Commonwealth v. Neiman*, 624 Pa. 53, 84 A.3d 603, 611 (2013) (quoting *Pa. State Ass'n of Jury Comm'rs v. Commonwealth*, 619 Pa. 369, 64 A.3d 611, 618 (2013)). Thus, a statute will not be found unconstitutional "unless it clearly, palpably, and plainly violates the Constitution." *Id.* If there is any doubt as to whether a challenger has met this high burden, we will resolve that doubt in favor of the statute's constitutionality. *Id.*

### 1. Single–Subject Requirement— Article III, Section 3

■ Article III, Section 3 of the Pennsylvania Constitution, titled "Form of Bills," states: "No bill shall be passed containing more than one subject, which shall be clearly expressed in its title, except a general appropriation bill or a bill codifying or compiling the law or a part thereof." Pa. Const. art. III, § 3.

"[T]he single subject rule of Article III, Section 3 was first included by the framers of our Commonwealth's organic charter in 1864, and then readopted as part of the 1874 Constitution, in order to effectuate 'the electorate's overall goal of curtailing legislative practices that it viewed with suspicion.'" *Neiman*, 84 A.3d at 611 (quoting *City of Phila.*, 838 A.2d at 586). In particular, there were two legislative practices the framers and the electorate sought to eliminate with their adoption of Article III, Section 3. *Neiman.* The first involved the insertion into a single bill of a number of distinct and independent subjects of legislation in order to deliberately hide the real purpose of the bill. *Id.* The second was the practice of "logrolling," which involves "embracing in one bill several distinct matters, none of which could singly obtain the assent of the legislature, and procuring its passage by combining the minorities who favored the individual matters to form a majority that would adopt them all." *Id.* (quoting *City of Phila.*, 838 A.2d at 586). "[T]he single-subject requirement prevents the attachment of riders that could not become law on their own to popular bills that are certain to pass." *City of Phila.*, 838 A.2d at 574.

■ Further, our Supreme Court observes that Article III, Section 3 serves other salutary purposes furthering the efficiency of the legislative process. The requirement that each piece of legislation pertain to only one subject creates a greater likelihood it will receive a more considered and thorough review by legislators than if it is aggregated with other pieces of legislation pertaining to different topics into a singular "omnibus bill," thereby creating a "jumbling together of incongruous subjects." *Neiman*, 84 A.3d at 612 (citations omitted). Additionally, "the single subject requirement proscribe[s] the inclusion of provisions into legislation without allowing for 'fair notice to the public and to legislators of the existence of the same.'" *Id.* (quoting *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383, 395 (2005) (*PAGE*)). Thus, it provides

a vital assurance to residents of this Commonwealth that they will be able to make their views and wishes regarding a particular piece of legislation known to their duly elected representatives before its final passage, and it concomitantly ensures that those representatives will be adequately apprised of the full scope

and impact of a legislative measure before being required to cast a vote on it. *Id.*

Our Supreme Court interprets Article III, Section 3 as mandating that a final bill enacted by the General Assembly meet two specific criteria: "First, the title of the bill must clearly express the substance of the proposed law: . . . . *Second, the differing topics within the bill must be 'germane' to each other.*" *Id.* (quoting *Jury Comm'rs,* 64 A.3d at 616 (emphasis added)). A review of recent Supreme Court cases that address the second criterion, *i.e.,* the single-subject rule, is helpful.

In 2003, in *City of Philadelphia,* the Supreme Court held that the challenged act, which contained numerous amendments to Title 53 of the Pennsylvania Consolidated Statutes (Municipal Corporations), violated the single subject requirement. The act at issue there covered a multitude of subjects, including provisions that altered the size and composition of the Pennsylvania Convention Center's governing board, effected a transfer of authority over taxis and limousines in Philadelphia from the Public Utility Commission to the Philadelphia Parking Authority, expanded bonding requirements for small contractors engaged in redevelopment activities in Philadelphia, prohibited police officers from participating in election campaigns, and granted new powers to parking authorities to undertake mixed-use development projects. In determining the act violated Article III, Section 3 of the Pennsylvania Constitution, the Court held there was no single unifying subject to which all of the provisions of the act were germane. In so doing, the Court rejected as overly broad the assertion that the primary object of the statute was the amendment of Title 53—

Municipalities, noting "virtually all of local government is a 'municipality.'" *Id.* at 589, 838 A.2d 566. In light of the boundless scope of such a topic, the Court held the act was, in essence, an omnibus bill that contravened the mandates of Article III, Section 3.

Of further note, shortly before our Supreme Court decided *City of Philadelphia,* this Court issued a decision in which we determined that an act amending the Judicial Code by codifying the DNA Act[7] and altering tort liability standards violated Article III, Section 3's single subject requirement. *See DeWeese v. Weaver,* 824 A.2d 364 (Pa.Cmwlth.2003) (*en banc*). In *DeWeese,* the act began as a bill that proposed to amend the DNA Act to require DNA samples from every felony sex offender, including those already convicted, and to eliminate the ability of such offenders to have their DNA records expunged. After several considerations and relatively minor amendments in the House and Senate, the House inserted amendments into the bill providing that, in civil cases where liability for negligence is attributed to more than one defendant, each defendant could only be held liable for proportional damages equal to his proportion of the total liability. As finally enacted, the act codified the previous stand alone, uncodified DNA Act as new Chapter 47 of the Judicial Code, and amended Chapter 71 of the Judicial Code, relating to comparative negligence. Rejecting the argument that the two chapters were related to the general subject of "the business of the courts," we stated:

> We cannot say that requiring DNA samples from incarcerated felony sex offenders bears a 'proper relation' to joint and several liability for acts of negli-

---

7. The Detection of Sexual and Violent Offenders Act (DNA Act), formerly the Act of May 28, 1995, P.L. 1009, 35 P.S. §§ 7651.101– 7651.1102, is now found at 44 Pa.C.S. §§ 2301–2336.

gence. The claim that the two subjects relate to judicial procedure is a reach. While expungement of a DNA record may arguably relate to the 'business of the courts,' Chapter 47's main purpose is to assist in the investigation and apprehension of criminals. The germane standard is not a high one, but [the challenged act] does not satisfy it. *Id.* at 370. Further, we explained: "The fact that the changes in substantive law effected by [the challenged act] were set forth as amendments to the Judicial Code does not, in and of itself, satisfy the requirements of Article III, Section 3." *Id.* The Supreme Court cited *DeWeese* approvingly in *City of Philadelphia.*[8]

About 10 years after its decision in *City of Philadelphia,* the Supreme Court considered an Article III, Section 3 challenge to an enactment that began as a bill proposing amendments to Section 1805 of the County Code[9] relating to procedures for the sale and auction of surplus farm equipment and personal property by county commissioners, and, as later amended and enacted, added subsection (f) to Section 401 of the County Code, 16 P.S. § 401(f), which authorized, by resolution, the abolition of the elected office of jury commissioner. *See Jury Comm'rs.* In determining the enactment violated the single-subject requirement, the Court distinguished prior decisions that rejected Article III, Section 3 challenges where the enactments pertained to only one municipality in the Commonwealth (Philadelphia), *see Spahn v. Zoning Bd. of Adjustment,* 602 Pa. 83, 977 A.2d 1132 (2009), or involved a single subject matter (gaming), *PAGE.* The Court stated that auctioning private property and farm surplus, and

eliminating an elected public office, were subjects "so far apart that there is no common focus without encompassing a limitless number of subjects." *Jury Comm'rs,* 64 A.3d at 618 (citation and quotation omitted). The Court also determined the act contained provisions pertaining to both legislative and executive functions of a board of county commissioners, with Section 401(f) invoking the legislative power of a resolution and Section 1805 falling under the executive function of contract execution. Relatedly, the act amended two separate articles of Chapter 1 of the County Code: Article IV (County Officers) and Article XVIII (Contracts). The Court also held that the proffered unifying subject of "powers of county commissioners" was too broad to unify such disparate topics in a single bill. Thus, the Court determined the act violated Article III, Section 3's single subject rule.

Less than a year later, in *Neiman,* our Supreme Court determined a statute amending the Judicial Code, which contained provisions relating to deficiency judgment procedures, asbestos statutes of limitations, county police jurisdiction and sexual offender registration requirements, violated Article III, Section 3's single subject requirement. In so doing, the Court explained:

In determining 'germaneness,' our Court has acknowledged that some degree of deference to the General Assembly's prerogative to amend legislation is required, due to the normal fluidity inherent in the legislative process, and, thus, we have deemed it is appropriate for a reviewing court to hypothesize a 'reasonably broad topic' which would unify the various provisions of a final bill

8. *See also DeWeese v. Weaver,* 880 A.2d 54 (Pa.Cmwlth.2005), *aff'd per curiam,* 588 Pa. 738, 906 A.2d 1193 (2006) (granting petitioners' motion for summary judgment on their

Article III, Section 3 challenge and declaring the challenged act unconstitutional and void).

9. Act of August 9, 1955, P.L. 323, *as amended,* 16 P.S. § 1805.

as enacted. *City of Philadelphia*, [838 A.2d at 588]. However, our Court has also stressed the 'reasonable' aspect of any proposed hypothetical unifying topic, in recognition of the fact that Article III, Section 3 would be rendered nugatory if such hypothetical topics were too expansive. *PAGE*, [877 A.2d at 395]. We observed that, 'no two subjects are so wide apart that they may not be brought into a common focus, if the point of view be carried back far enough.' *Id.* (quoting *Payne v. Sch. Dist. of Coudersport*, [31 A. 1072 (Pa. 1895))]. Consequently, in determining whether a proposed unifying subject is sufficiently narrow so as to pass muster under Article III, Section 3, our Court must examine the various subjects contained within a legislative enactment and determine whether they have a nexus to a common purpose. Stated another way, our task is to ascertain whether the various components of the enactment are part of 'a unifying scheme to accomplish a single purpose.' *City of Philadelphia*, [838 A.2d at 589] (citing *Payne*).

In this regard, the mere fact that a piece of legislation amends a particular title of the Pennsylvania Consolidated Statutes, as in *City of Philadelphia*, or amends a particular article of a codified body of statutes such as the County Code, like the legislation in *Jury Commissioners*, will not automatically fulfill the requirements of Article III, Section 3, as our rulings in those cases established. Thus, in the case at bar, the Superior Court properly determined that, merely because all of the various components of Act 152 amended 'Title 42,' this does not establish its compliance with Article III, Section 3.

Likewise, the proposed unifying subjects for Act 152 offered by the Commonwealth ('refining civil remedies or relief') and the General Assembly ('judicial remedies and sanctions') are far too expansive to satisfy Article III, Section 3, as such subjects are virtually boundless in that they could encompass, respectively, any civil court proceeding which could be brought in the courts of this Commonwealth, and any power of the judiciary to impose sanctions on, or order the payment of damages by, a party to civil litigation. We therefore decline to endorse such broad suggested topics, as they would have the effect of 'render[ing] the safeguards of [Article III,] Section 3 inert.' *PAGE*, [877 A.2d at 395].

Further, upon considered reflection, we cannot discern any other common nexus for the myriad disparate provisions of Act 152, inasmuch as we can see no reasonable basis under which deficiency judgment procedures, asbestos statutes of limitations, county police jurisdiction, and sexual offender registration requirements act together as 'a unifying scheme to accomplish a single purpose.' *City of Philadelphia*. Because there is simply no common focus to all of [the statute's] provisions, this case presents a situation akin to that which existed in our decisions in *City of Philadelphia* and [*Jury Commissioners*], in which we rejected, in turn, the proposed unifying subjects of 'municipalities' and 'powers of county commissioners' as being too broad, and, thus, violative of the single subject rule. As a result, we are constrained to conclude that Act 152 clearly, palpably, and plainly violates Article III, Section 3 of the Constitution. . . .

*Neiman*, 84 A.3d at 612–13.

Guided by the above principles, we conclude that Act 192 clearly, palpably and plainly violates the single subject requirement set forth in Article III, Section 3 of the Pennsylvania Constitution. In particu-

lar, Act 192: imposes *criminal* penalties for the theft of secondary metal; amends record disclosure responsibilities of the Pennsylvania State Police; and, creates a *civil* cause of action for individuals and organizations against municipalities to challenge firearm legislation, including broad provisions for standing and attorney fees awards to successful challengers. We agree with Petitioners that the primary subjects covered by Act 192, which, on one hand set forth criminal penalties for theft of copper and aluminum, and, on the other hand, create a civil cause of action to challenge municipal firearms legislation, are so disparate that they lack any clear, common nexus. Thus, we discern no single unifying subject to which all of Act 192's provisions are germane.

Moreover, we disagree with Legislative Respondents that the purported single unifying purpose of "amending the Crimes Code" is sufficient to establish compliance with Article III, Section 3. Our Supreme Court rejected as overly broad the proffered unifying subjects of "refining civil remedies" or "judicial remedies and sanctions," *see Neiman*, "powers of county commissioners," *see Jury Commissioners*, and "municipalities," *see City of Philadelphia*. Similarly, we reject as overly broad Legislative Respondents' proffered unifying subject of "amending the Crimes Code" under the facts presented here. Indeed, in an analogous context this Court held, "to conclude that the General Assembly could initiate a piece of legislation in the context of the Crimes Code and rely upon that concept as a unifying justification for amendments to bills under the Crimes Code that contain no nexus to the conduct to which the original legislation was directed would stretch the Supreme Court's meaning of 'reasonably broad terms.'" *Marcavage v. Rendell*, 936 A.2d 188, 193 (Pa.Cmwlth.2007), *aff'd*, 597 Pa. 371, 951 A.2d 345 (2008). That determination applies with equal force here.

Furthermore, in *Neiman*, our Supreme Court explained that the mere fact that a piece of legislation amends a particular title of the Pennsylvania Consolidated Statutes does not automatically fulfill the requirements of Article III, Section 3. *Id.; City of Phila*, 838 A.2d at 590 (fact that all of act's provisions were codified in Title 53 of the Pennsylvania Consolidated Statutes was "of little constitutional importance"); *DeWeese*. Also, like the act declared unconstitutional in *Jury Commissioners*, Act 192 amends two distinct articles of the Crimes Code (Article C ("Offenses Against Property") and Article G ("Miscellaneous Offenses")).

Nevertheless, Legislative Respondents contend, to the extent this Court finds "amending the Crimes Code" is "too broad of a single subject to withstand Article III, Section 3 scrutiny ... the single subject of Act 192 is to amend the Crimes Code, but only with respect to statutes that involve the regulation of firearms or the ability to own a firearm (a conviction of theft of secondary metals or criminal trespass graded as a misdemeanor of the first degree or higher precludes a person from possessing a firearm under Federal law)." Br. for Resp'ts Mike Turzai, Speaker of the House of Representatives, and Joseph B. Scarnati, President Pro Tempore of the Senate, at 34. Again, we disagree. In the absence of any further clear explanation, we fail to discern how this posited theme supplies the necessary unifying topic between the disparate subjects of criminal penalties for theft of metal and civil suits through which an expansive class of parties may seek to invalidate municipal firearms legislation and potentially recover attorney fees.

Further, we reject Legislative Respondents' reliance on other cases that do not compel the result they seek here. *See Spahn; Fumo v. Pa. Pub. Util. Comm'n*,

719 A.2d 10 (Pa.Cmwlth.1998); *Ritter v. Commonwealth*, 120 Pa.Cmwlth. 374, 548 A.2d 1317 (1988), *aff'd per curiam*, 521 Pa. 536, 557 A.2d 1064 (1989).

Initially, we note, this Court's decisions in *Fumo* and *Ritter* predate our Supreme Court's seminal decision in *City of Philadelphia*. In *City of Philadelphia*, the Supreme Court observed:

> [D]espite the continued strong public policy underlying the single-subject requirement, some Pennsylvania courts have become extremely deferential toward the General Assembly in Section III challenges. As [r]espondents suggest, they have tended to apply the single-subject standard to validate legislation containing many different topics so long as those topics can reasonably be viewed as falling under one broad subject. While this trend is consistent in principle with some early pronouncements of this Court, it has resulted in a situation where germaneness has, in effect, been diluted to the point where it has been assessed according to whether the court can fashion a single, overarching topic to loosely relate the various subjects included in the statute under review.

*Id.* at 587, 838 A.2d 566 (citation omitted). In so doing, the Supreme Court specifically cited *Fumo* as one of several cases that applied a rather broad approach to the concept of "germaneness" under Article III, Section 3, which, although "appropriate to some degree" must be limited "as otherwise virtually all legislation, no matter how diverse in substance, would meet the single-subject requirement." *Id.* at 588, 838 A.2d 566.

Further, *Fumo* is distinguishable. There, this Court declined to invalidate as violative of Article III, Section 3 a bill that amended various provisions of the Public Utility Code, 66 Pa.C.S. §§ 101–3316, including regulation of taxicabs and deregulation of electricity generation, on the ground that the bill involved amendments to the Public Utility Code and related subjects dealing with public utility regulation.

Unlike in *Fumo*, we are not here confronted with amendments relating to the regulation of public utilities. Rather, the legislation at issue now covers the varied subjects of setting forth criminal penalties for certain individual conduct and creating a civil right of action to challenge different municipal conduct. The distinctions between criminal and civil remedies, between individual and municipal conduct, and between theft and enacting firearms regulation are so pronounced that they confound every effort to focus on a unifying theme.

In *Ritter*, the legislation at issue amended various chapters of the Crimes Code by providing for rights of a district attorney in litigation involving prisoners; providing additional penalties for underage drinking and sale of alcohol to minors; providing additional penalties for drug trafficking to minors; providing penalties for the scattering of rubbish; and, regulating matters relating to the performance and funding of abortions. In rejecting the petitioners' Article III, Section 3 challenge, this Court stated: "Despite the disparity in the types of acts described for which sanctions are imposed, we have no problem in concluding that [the act at issue], as enacted, embraces a single subject—i.e., amendments to the Penal Code.... [T]o the extent that the petitioners present a justiciable claim, we find no violation of Article III, Section 3, *since all of the amendments relate to proscribed acts under the Penal Code*. To find otherwise would make unified amendments to codification of the law impossible." *Id.* at 1321 (emphasis added).

We reject Legislative Respondents reliance on *Ritter* for two reasons. First, the vitality of this Court's analysis in *Ritter* is, at best, uncertain in light of the more

precise analysis employed in more recent Supreme Court cases discussed above. *See Neiman; Jury Comm'rs; City of Phila.* In addition, unlike the amendments in *Ritter*, the components of Act 192 do not all relate to proscribed acts under the Crimes Code. To the contrary, along with setting forth criminal penalties, Act 192 creates a civil action to challenge local firearms regulations.

Further, our Supreme Court's decision in *Spahn* is inapposite. There, the Supreme Court considered an Article III, Section 3 challenge to an amendment to the First Class City Home Rule Act.[10] The amendment contained two subjects: a provision increasing fines for Philadelphia Code violations, and a provision governing standing in zoning appeals in Philadelphia. In rejecting the Article III, Section 3 challenge, the Court stated the amendment applied to the single topic of Philadelphia home rule government, seeking only to amend the First Class City Home Rule Act, which only applied to Philadelphia. Further, the amendment was narrower than Philadelphia home rule; instead, it related to a single article of the First Class City Home Rule Act, defining "general grants of power and limitations." For these reasons, the Court held the challenged legislation did not violate the single subject requirement.

Here, unlike in *Spahn*, we are not confronted with legislation that only applies to a single municipality. Indeed, in later distinguishing *Spahn* in *Jury Commissioners*, the Supreme Court stated, "while *Spahn* concerned a single municipality in the Commonwealth (Philadelphia), and *PAGE* involved a singular subject matter (gaming), [the statute at issue] affects every county in the Commonwealth, save for Philadelphia, Allegheny, and counties which have previously passed home rule charters. On this point alone, we agree with [the] [a]ppellants that this case is located much closer to *City of Philadelphia* than *Spahn* or *PAGE* on the spectrum of Article III, Section 3 constitutionality." *Jury Comm'rs*, 64 A.3d at 618. Here, Act 192 applies to all municipalities in the Commonwealth. Further, unlike the unifying subject at issue in *Spahn*, which related to a single article of the First Class City Home Rule Act, Act 192's provisions, which amend two different articles of the Crimes Code by criminalizing the theft of secondary metals and creating a civil action by which to challenge firearms legislation, are so far apart that there is no common focus.[11]

Thus, after deferential review we agree with Petitioners that Act 192 clearly, palpably and plainly violates the single subject rule of Article III, Section 3 of the Pennsylvania Constitution. Because of

---

10. Act of April 21, 1949, P.L. 665, *as amended*, 53 P.S. §§ 13101–13157.

11. We also reject Legislative Respondents' reliance on *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 583 Pa. 275, 877 A.2d 383, 395 (2005) (*PAGE*), and *Christ the King Manor v. Dep't of Pub. Welfare*, 911 A.2d 624 (Pa.Cmwlth.2006) (*en banc*), *aff'd per curiam*, 597 Pa. 217, 951 A.2d 255 (2008). The challenged legislation in *PAGE*, the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa. C.S. §§ 1101–1904, created the Gaming Control Board, established policies and proce-

dures for licenses for slot machines, enacted provisions to assist the state horse racing industry through other gaming, and provided for the administration and enforcement of the gaming law. Thus, the single unifying subject was clear: the regulation of gaming. Similarly, the single unifying subject in the challenged legislation in *Christ the King* was the regulation of the Commonwealth's publicly funded healthcare services. Unlike the narrow single unifying topics in those cases, Act 192's disparate provisions contain no clear, common nexus. As such, we reject Legislative Respondents' reliance on these cases.

this constitutional infirmity, we need not also decide whether Act 192 conforms to the clear title requirement, as asserted by the Legislative Respondents in support of their preliminary objections.

### 2. Original Purpose Requirement— Article III, Section 1

■ Akin to our determination that Act 192 violates Article III, Section 3's single subject requirement, we also agree with Petitioners that Act 192 violates Article III, Section 1 of the Pennsylvania Constitution. Article III, Section 1, titled, "Passage of Laws," states: "No law shall be passed except by bill, and no bill shall be so altered or amended, on its passage through either House, as to change its original purpose." PA. CONST. art. III, § 1.

■ A court entertaining a challenge to legislation under Article III, Section 1 must conduct a two-part inquiry. *PAGE.* First, the Court must consider the legislation's original purpose and compare it to the final purpose to determine whether there has been an alteration or amendment that changed the original purpose. *PAGE; Marcavage.* Second, the Court must consider whether the title and contents of the legislation are deceptive in their final form. *PAGE.* Important for current purposes, "[t]he challenged legislation must survive both inquiries to pass constitutional muster." *Marcavage,* 936 A.2d at 192.

■ Under the first prong, the reviewing Court must view the legislation's original purpose in "reasonably broad terms," so as to provide the General Assembly with a "full opportunity to amend and even expand a bill, and not run afoul of the constitutional prohibition on an alteration or amendment that changes its original purpose." *Id.* (quoting *PAGE,* 877 A.2d at 409). Further, a reviewing court should "hypothesize, based on the *text* of the statute, as to a reasonably

broad original purpose." *Id.* (emphasis in original.)

In *PAGE,* the Supreme Court considered a challenge to the constitutionality of the Gaming Act, which began as a one-page bill that provided the Pennsylvania State Police with the authority to perform background checks on applicants seeking licenses from the State Horse and Harness Racing Commissions. After passing through three considerations in the House and two considerations in the Senate, the bill was extensively amended on its third consideration in the Senate. As amended, and ultimately enacted, the 145–page bill included provisions creating the Pennsylvania Gaming Control Board, authorizing the creation of a number of slot machine casinos, establishing a number of special funds, and among other things, provided for exclusive jurisdiction in the Supreme Court regarding disputes over the issuance of licenses and challenges to the Gaming Act. In determining the challenged legislation did not violate the original purpose requirement, the Court in *PAGE* stated:

[W]e first consider the original purpose of the bill, and do so in reasonably broad terms; we then compare the original purpose to the final purpose to determine if the purpose has changed. As introduced, [the bill] provided the State Police with the power and duty to perform criminal background checks on, and identify through conducting fingerprinting, those applicants seeking a license from the State Horse Racing and State Harness Racing Commissions. Considering the original purpose in reasonably broad terms, we believe that here, and in this instance akin to our finding above regarding a single unifying subject, the original purpose of the bill was to regulate gaming. As finally passed, although significantly amended and expanded, we find that the primary objective of the legislation was to regu-

late gaming. Based on the above, we conclude that the bill was not altered or amended to change its original purpose. *Id.* (citation omitted).

Conversely, in *Marcavage*, this Court considered a constitutional challenge to a statute that amended the Crimes Code to expand the scope of offense of ethnic intimidation. The act at issue began as a bill amending the Crimes Code to provide for the offense of agricultural crop destruction. After passing through three considerations in the House, and two in the Senate, the bill was amended on its third consideration by deleting the language relating to crop destruction passed by the House and replacing it with language expanding the scope of protected individuals for purposes of defining the offense of ethnic intimidation under the Crimes Code. As amended, and ultimately enacted, the final title to the bill read: "An Act Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, further providing for ETHNIC INTIMIDATION." *Id.* at 191. Several petitioners filed suit in this Court's original jurisdiction challenging the act on numerous grounds, including an allegation that the act was amended to change its original purpose in violation of Article III, Section 1. On cross-motions for summary relief this Court agreed with the petitioners that the act violated Article III, Section 1. Speaking through Judge Colins, we explained:

In light of the comparative construct required by *PAGE*, we agree with [the] [p]etitioners that [the act] did not retain its original purpose as it moved through the enactment process. The original purpose of [the act], viewed in reasonably broad terms, was to criminalize crop destruction. As ultimately enacted, [the act] expanded the classification of persons protected under the offense of ethnic intimidation. Unlike the legislation in *PAGE*, both the initial and final

versions of [the act] do not regulate the same discrete activity. The original version and final version of [the act] regulate vastly different activities, albeit under the broad heading of crime. However, to conclude that the General Assembly could initiate a piece a legislation in the context of the Crimes Code and rely upon that concept as a unifying justification for amendments to bills under the Crimes Code that contain no nexus to the conduct to which the original legislation was directed would stretch the Supreme Court's meaning of 'reasonably broad terms.' As directed by the Supreme Court, when we 'hypothesize, based on the text of the initial bill,' we cannot conclude that the amendments retained the original purpose of [the act].... Therefore, we conclude [the act] was altered to change its original purpose and [the] [p]etitioners are entitled to summary relief on this basis.

*Id.* at 193–94. On further appeal, the Supreme Court affirmed for the reasons set forth in this Court's opinion and expressly adopted this Court's opinion as that of its own. *Marcavage v. Rendell,* 597 Pa. 371, 951 A.2d 345 (2008).

Here, the original title of HB 80 was "AN ACT Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, defining the offense of theft of secondary metal; and prescribing penalties." Compl. at ¶ 19; Ex. A. However, the statute's final purpose was set forth as follows:

Amending Title 18 (Crimes and Offenses) of the Pennsylvania Consolidated Statutes, in burglary and other criminal intrusion, further providing for the offense of criminal trespass; defining the offense of theft of secondary metal; ~~and~~ prescribing penalties; and, in firearms and other dangerous articles, further

providing for Pennsylvania state police and for limitation on the regulation of firearms and ammunition.

Compl. at ¶ 47; Ex. I.

As in *Marcavage*, HB 80 did not retain its original purpose as it moved through the enactment process. The original purpose of HB 80, viewed in reasonably broad terms, was to criminalize theft of secondary metal. As ultimately enacted, HB 80 criminalized the theft of secondary metal, amended record disclosure responsibilities of the Pennsylvania State Police, and created a private civil right of action for individuals and organizations to challenge municipal firearms legislation, including standing and attorney fee provisions. Like the act at issue in *Marcavage*, the original and final versions of HB 80 do not regulate the same discrete activity. The original purpose of HB 80 pertained solely to the penalties for the theft of secondary metal, while the final purpose was altered so as to include, among other things, creation of a civil action through which to challenge local firearms legislation. Clearly, these are vastly different activities. As directed by the Supreme Court, when we "hypothesize, based on the *text* of the initial bill," we cannot conclude that the amendments retained the original purpose of Act 192. *Marcavage*, 936 A.2d at 193 (emphasis in original). Thus, as in *Marcavage*, we agree with Petitioners that Act 192 was altered to change its original purpose.

Further, we reject Legislative Respondents' attempts to distinguish *Marcavage* on the ground that the original purpose of the legislation there was deleted and replaced, while here the original purpose was retained and supplemented. We disagree that the General Assembly may alter the original purpose of legislation so long as it retains the original purpose in addition to its new purpose. Further, to the extent Legislative Respondents ask that we revisit our holding in *Marcavage*, principles of *stare decisis* preclude us from doing because the Supreme Court adopted this Court's opinion as that of its own.

In addition, contrary to Legislative Respondents' assertions, this is not a case in which the original purpose and final purpose of the act at issue remained the same when viewed in "reasonably broad terms," such as the regulation of: compensation for government officials,[12] asbestos-related liability,[13] human services programs regulated by the Department of Public Welfare,[14] or Pennsylvania's publicly funded healthcare programs.[15, 16]

In short, because Act 192 was altered to change its original purpose, it does not pass the first part of the two-part constitutional inquiry. Thus, after deferential review, we must conclude Act 192 violates Article III, Section 1 of the Pennsylvania Constitution. Because a legislative enactment must pass both parts of the two-part inquiry, it is a useless exercise to also consider the Legislative Respondents' pre-

---

**12.** *See Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918 (2006).

**13.** *See Markovsky v. Crown Cork & Seal Co.*, 107 A.3d 749 (Pa.Super.2014).

**14.** *Washington v. Dep't of Pub. Welfare*, 71 A.3d 1070 (Pa.Cmwlth.2013).

**15.** *Christ the King Manor v. Dep't of Pub. Welfare*, 911 A.2d 624 (Pa.Cmwlth.2006) (*en banc*), aff'd per curiam, 597 Pa. 217, 951 A.2d 255 (2008).

**16.** Moreover, we reject Legislative Respondents' reliance on *Fumo v. Pennsylvania Public Utility Commission*, 719 A.2d 10 (Pa. Cmwlth.1998). More particularly, this Court's decision in *Fumo* relied largely on the Supreme Court's decision in *Consumer Party v. Commonwealth*, 510 Pa. 158, 507 A.2d 323 (1986), which the Supreme Court disavowed in *PAGE* when it set forth a new two-prong test for evaluating claims brought under Article III, Section 1.

liminary objections raising the second part of the constitutional inquiry, deceptive title.

### III. Conclusion

Based on our determinations that Act 192 violates Pennsylvania Constitution Article III, Section 1 and Section 3, relating to original purpose and single subject, we grant Petitioners' motion for summary relief, and we declare Act 192 unconstitutional and void. The Commonwealth is enjoined from enforcing any provisions of Act 192 or taking any actions in accordance with Act 192. As a result, the preliminary objections of Respondents Mike Turzai, Speaker of the House of Representatives, and Joseph B. Scarnati, President Pro Tempore of the Senate, are rendered moot. *See, e.g., Marshall v. Pa. Bd. of Prob. & Parole,* 162 Pa.Cmwlth. 256, 638 A.2d 451 (1994) (application for summary relief may be granted without the filing of an answer and prior to disposing of outstanding preliminary objections).

### *ORDER*

**AND NOW,** this 25th day of June, 2015, Petitioners' Motion for Summary Relief and Entry of Judgment Pursuant to Pa. R.A.P. 1532(b) is **GRANTED.** The preliminary objections of Respondents Mike Turzai, Speaker of the House of Representatives, and Joseph B. Scarnati, President Pro Tempore of the Senate, are **DISMISSED as MOOT.** Act 192 of 2014 is declared **UNCONSTITUTIONAL** and **VOID.** The Commonwealth is enjoined from enforcing any provisions of Act 192 or taking any actions in accordance with Act 192.

---

1. Ostensibly, this last section was also prompted due to clear legislative preemption in the area of firearm possession and the enactment by local bodies of ordinances that penalize what the state legislature and the courts have consistently said is lawful conduct throughout the entire Commonwealth. *See, e.g., Ortiz v. Commonwealth,* 545 Pa. 279,

**CONCURRING AND DISSENTING OPINION BY Judge PATRICIA A. McCULLOUGH.**

Perceiving a dilemma in the case law and constitutional principles, I concur in part and dissent in part.

Act 192 of 2014 is enacted legislation consisting of four sections that amend the Crimes Code: (1) the legislation started out by creating the new crime of theft by secondary metal, listing its elements and sentencing grade; (2) this new crime of theft by secondary metal was then included as a sub-crime (apparently a non-merger offense for double jeopardy purposes) within the already-established crime of criminal trespass; (3) the legislature also amended the Pennsylvania Uniform Firearms Act (UFA) to insert a provision obligating the state police to report information that a person does not have the lawful right to possess a firearm; and, (4) the legislature revised the UFA to allow citizens who lawfully possess a firearm to anticipatorily challenge local laws that seek to fine or otherwise punish them—even criminally—for conduct that the state legislature has unambiguously declared to be the lawful possession of a firearm. *See Dillon v. City of Erie,* 83 A.3d 467, 476 (Pa.Cmwlth.2014) (*en banc*) (Brobson, J., dissenting, joined by Leavitt, J., and McCullough, J.); *National Rifle Association v. City of Pittsburgh,* 999 A.2d 1256, 1260–63 (Pa.Cmwlth.2010) (Brobson, J., dissenting) (concluding that our common law doctrine of standing has served as an "insurmountable obstacle to pre-enforcement review of criminal ordinances" that regulate firearm possession).[1]

---

681 A.2d 152 (1996); *Dillon v. City of Erie,* 83 A.3d 467 (Pa.Cmwlth.2014) (*en banc*); *National Rifle Association v. City of Philadelphia,* 977 A.2d 78, 81–82 (Pa.Cmwlth.2009) (*en banc*); *Clarke v. House of Representatives,* 957 A.2d 361 (Pa.Cmwlth.2008); *Schneck v. City*

Because there appears to be only one case that clearly addresses whether amending the Crimes Code is a permissible subject under Article III, section 3 of the Pennsylvania Constitution, I respectfully disagree with the Majority that Act 192 violates the single-subject rule. On materially indistinguishable facts, this Court, sitting *en banc*, held in *Ritter v. Commonwealth*, 120 Pa.Cmwlth. 374, 548 A.2d 1317 (*en banc*), aff'd per curiam, 521 Pa. 536, 557 A.2d 1064 (1989), that the single-subject rule was not violated where amendments to the Crimes Code were made: "providing for rights of a district attorney in litigation involving prisoners; providing additional penalties for underage drinking and sale of alcohol to minors; providing additional penalties for drug trafficking to minors; providing penalties for the scattering of rubbish; and regulating matters relating to the performance and funding of abortions." *Id.* at 1318. We reasoned: "Despite the disparity in the types of acts described for which sanctions are imposed, we have no problem in concluding that [the law], as enacted, embraces a single subject—*i.e.*, amendments to the Penal Code." *Id.* at 1321. The *Ritter* Court further explained that the single-subject rule was not violated "since all of the amendments relate to proscribed acts under the Penal Code. To find otherwise would make unified amendments to codification of the law impossible." *Id.*

Here, the legislature created a new criminal offense (and made it a sub-crime) and amended the UFA to further define and effectuate its distinction between the unlawful versus lawful possession of a firearm; as in *Ritter*, these amendments all relate to proscribed acts under the Crimes Code. I believe the Crimes Code is particular in nature and submit that regulating criminal activity is a legislative topic that encompasses much more than defining the basic elements of a crime and the sentence to be imposed. Indeed, a criminal conviction often carries with it collateral consequences for the convicted, along with administrative tasks and duties for the agencies and affected citizens; *e.g.*, Megan's Law registration and reporting;[2] parental termination; deportation; loss of the right to vote; loss of driving privileges; loss of the right to lawfully possess a firearm; and restoration and preservation of the right to lawfully possess a firearm.

Following our decision in *Ritter*, I would conclude that Act 192 possesses a unifying subject for constitutional purposes. Notably, our Supreme Court affirmed *Ritter* in a *per curiam* order, no intervening precedent has overruled *Ritter*,[3] and that case remains good law.

As to the Article III, section 1 challenge, I agree with the Majority that pursuant to *Marcavage v. Rendell*, 936 A.2d 188 (Pa. Cmwlth.2007) (*en banc*), aff'd per curiam with reasoning, 597 Pa. 371, 951 A.2d 345 (2008), Act 192 violates the original purpose rule. In that case, this Court, also sitting *en banc*, analyzed a legislative

---

of *Philadelphia*, 34 Pa.Cmwlth. 96, 383 A.2d 227 (1978).

In essence, our legislature enacted this provision to preserve the integrity of its own Crimes Code and what it has designated to be the lawful possession of a firearm. In this regard, I disagree with the Majority that this section "creates a civil cause of action," (Maj. op. at 1283, 1285), and propose instead that the section is inexorably related to the scheme of the UFA and the Crimes Code.

**2.** Sections 9799.10–9799.41 of the Sentencing Code, 42 Pa.C.S. §§ 9799.10–9799.41.

**3.** In *City of Philadelphia v. Commonwealth*, 575 Pa. 542, 838 A.2d 566, 587–88 (2003), our Supreme Court criticized certain decisions from this Court dealing with the single-subject rule as being too deferential toward the legislature. *Ritter* was not one of those cases.

amendment to the Crimes Code that marked a shift (and abandonment) from the original purpose of defining the criminal offense of agriculture crop destruction to the sole purpose of re-defining the crime of ethnic intimidation. We held:

> The original purpose of [the law], viewed in reasonably broad terms, was to criminalize crop destruction. As ultimately enacted, [the law] expanded the classification of persons protected under the offense of ethnic intimidation.... The original version and final version of [the law] regulate vastly different activities, albeit under the broad heading of crime. However, to conclude that the General Assembly could initiate a piece a [sic] legislation in the context of the Crimes Code and rely upon that concept as a unifying justification for amendments to bills under the Crimes Code that contain no nexus to the conduct to which the original legislation was directed would stretch the Supreme Court's meaning of 'reasonably broad terms.'

*Marcavage*, 936 A.2d at 193.

Our decision in *Marcavage*, which only addressed the original purpose issue, was affirmed *per curiam* by the Supreme Court, explicitly adopting this Court's rationale. However, this Court in *Ritter* addressed an original purpose challenge in addition to the single-subject challenge and concluded, directly opposite to *Marcavage*, that the original purpose of the law, that is, amending the Crimes Code, was constitutionally maintained. *See Ritter*, 548 A.2d at 1320.

Despite this apparent conflict in the case law, I believe that *Marcavage* is entitled to greater precedential weight on the issue of original purpose and is binding because the Supreme Court affirmed on our rationale in that case while *Ritter* was summarily affirmed *per curiam*. *See Commonwealth v. Tilghman*, 543 Pa. 578, 673 A.2d 898, 904 (1996) (discussing the prece-

dential effect of *per curiam* orders issued by the Supreme Court).

There remains, however, the question of whether there is a legally conceptual basis to differentiate between a single-subject and an original purpose constitutional challenge. If an original purpose is lost along the legislative way, then, too, must be its unifying subject, and vice versa. As the scrambled egg is both white and yolk, the purpose and subject of legislation are one and the same, and when one leaves the picture so must the other.

In light of the above, it would appear that the legislature's ability to amend the Crimes Code in a constitutional manner is unresolved. The concept of "crimes," once a creature of common law, has been codified in the Crimes Code and probably represents the "bread and butter" of our legislature's work, constantly necessitating minor revisions and major amendments. Under the Majority's analysis, it is unclear how our legislature can amend the Crimes Code to comport with both the single-subject and original purpose rules: just amending one crime at a time; just amending the same type of crimes (*e.g.*, property offenses, offenses against the person, etc.); just amending the penalties and/or the elements of all crimes; just creating new crimes; just amending collateral measures for certain and/or all kinds of crimes; or some combination of the above? Obviously, the legislature needs a degree of flexibility to amend the Crimes Code in an efficient and effective manner, especially considering the daily stream of judicial opinions interpreting, applying, and entertaining constitutional challenges to its provisions.

For these reasons, I respectfully concur in part and dissent in part.